## OPINION OF THE JUSTICES.

OPINION OF THE JUSTICES TO THE HOUSE OF REPRESENTATIVES.

*Constitutional Law*, Freedom of association, Freedom of speech and press, Political contributions. *Elections*, Political contributions.

A bill defining and restricting the "total receipts" a political candidate may raise in the aggregate in years other than the year in which the candidate is running for election, if enacted into law, would, under current decisions of the United States Supreme Court, violate rights of free expression and association guaranteed by the First and Fourteenth Amendments to the United States Constitution [1205-1212]; consequently, this court declined to express its opinion whether the bill would violate the protections of free expression and association granted by art. 16, as amended by art. 77 of the Amendments, and art. 19 of the Massachusetts Declaration of Rights [1212].

On July 28, 1994, the Justices submitted the following answers to questions propounded to them by the House of Representatives.

To the Honorable the House of Representatives of the Commonwealth of Massachusetts:

The undersigned Justices of the Supreme Judicial Court respectfully submit their responses to the questions set forth in an order adopted by the House of Representatives on May 25, 1994, and transmitted to this court on that day. The order recites that Senate No. 311, a bill pending before the General Court, entitled "An Act for accountable politics," in § 20 thereof, amends G. L. c. 55 by adding a new § 6B. Subsection (6) of the proposed section establishes limits on the amount of total receipts a political candidate may raise in the years other than the year in which the candidate is running for election; provides that, in calculating "total re-

ceipts," any balance carried forward from an election year shall be included, but unpaid debts incurred in an election year shall not be included; and sets different limits based on the political office being sought. The full text of subsection (6) is as follows:

> "(6) No candidate shall, in the years other than the year in which the candidate is running for election, raise in the aggregate total receipts in excess of thirty thousand dollars in the case of a candidate for state representative, sixty thousand dollars in the case of a candidate for state senator, one hundred and twenty thousand dollars in the case of a candidate for lieutenant governor, attorney general, auditor, state secretary, treasurer, and receiver general, and two hundred and fifty thousand dollars in the case of a candidate for governor; provided, however, that in calculating said total receipts, unpaid debts incurred in election years shall be excluded.

> "The following restrictions apply to those candidates for whom the above restrictions do not apply: in the case of a candidate seeking public office in a city, town or district, no candidate shall, in the years other than the year in which the candidate is running for election, raise in the aggregate total receipts in excess of the following amounts; provided, however, that in calculating said total receipts, unpaid debts incurred in election years shall be excluded:

> "(a) in the case of a city, town or district with a population greater than 250,000 — one hundred and twenty thousand dollars;

> "(b) in the case of a city, town or district with a population between 140,001 and 250,000 — sixty thousand dollars;

"(c) in the case of a city, town or district with a population between 36,001 and 140,000 — thirty thousand dollars;

"(d) in the case of a city, town or district with a population between 18,001 and 36,000 — fifteen thousand dollars;

"(e) in the case of a city, town or district with a population no more than 18,000 — seven thousand and five hundred dollars.

"For the purposes of this paragraph only, the term 'total receipts' shall include any balance carried forward from the election year added to the sum total of all contributions received during non-election years. Any contributions received in excess of the amounts specified in this paragraph shall either be returned to contributors or shall be distributed in accordance with section 18, paragraph VI of this chapter.[1]"

For convenience, in the remainder of this opinion we shall frequently refer to subsection (6) as the "Bill."

The order further recites that grave doubt exists as to the constitutionality of the Bill and presents to us the following two questions:

"1. Would said subsection (6) of said Section 6B of said Chapter 55 contained in said Section 20 of said Senate No. 311, if enacted into law, violate the right to freedom of expression or association under the First and Fourteenth Amendments to the Constitution of the United States, in that it defines and restricts the total receipts a candidate may raise in the aggregate in years other than election years?

---

[1]This reference appears to be to that part of G. L. c. 55, § 18 (1992 ed.), which specifies that certain "residual funds" may be donated to the Local Aid Fund, public charities, scholarship funds, or city or town general funds.

"2. Would said subsection (6) of said Section 6B of said Chapter 55 contained in said Section 20 of said Senate No. 311, if enacted into law, violate the right to freedom of expression under Article XVI of Part the First of the Constitution of the Commonwealth, or freedom of association under Article XIX of said Part the First of the Constitution of the Commonwealth, in that it defines and restricts the total receipts a candidate may raise in the aggregate in years other than election years?"

We begin our analysis with two general observations about the Bill. First, because the definition of "total receipts" quoted above is followed immediately by a sentence which provides for the return of "contributions" in excess of statutory limits, and which makes no mention of the return of any "balance carried forward," the Bill expresses a legislative purpose that a candidate who has on hand a balance of campaign funds from an election year is permitted to retain that balance even if it exceeds statutory limits. In such a situation, however, the Bill prohibits the candidate from receiving any additional contributions. Second, while the Bill does not indicate whether a candidate's own funds are included within the category of "total receipts" that the candidate "raises," § 20 of proposed Senate No. 311 also makes provision for the insertion in G. L. c. 55 of a new § 7B, which reads as follows: "Any candidate may make expenditures without limitation for the purposes of his own campaign and make contributions without limitation to the candidate's committee organized on his own behalf." This provision comports with Federal constitutional decisional law in the area of campaign finance restrictions which makes clear that a candidate's personal contributions cannot be included within the Bill's calculation of "total receipts" raised by the candidate. See *Buckley* v. *Valeo*, 424 U.S. 1, 51-54 (1976) (declaring unconstitutional Federal statute limiting what candidate could personally spend on campaign).

1. We turn now to the first question, which asks whether the Bill would violate rights of free expression and association guaranteed by the First Amendment to the United States Constitution (as made applicable to the States through the Fourteenth Amendment). At the outset, it will be helpful to comment on the Bill's provisions in their capacity as limitations on either contributions or expenditures. The United States Supreme Court has "consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending." *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 259-260 (1986). The distinction between contributions and expenditures originated in *Buckley* v. *Valeo*, *supra*, the Court's leading decision on constitutional issues in the regulation of campaign financing, which reflects the Court's view that differing First Amendment interests are implicated by the two kinds of limitations. An expenditure limitation, the Court said in the *Buckley* decision, "necessarily reduces the quantity of expression . . . because virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Id.* at 19. A contribution limitation, on the other hand, "entails only a marginal restriction upon the contributor's ability to engage in free communication," because "[t]he quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing." *Id.* at 20-21. Contribution limitations do, however, the Court observed, limit the ability of contributors to affiliate with candidates or with "like-minded persons." *Id.* at 22. It is this impingement on the freedom of association, not a restriction on speech, that the Court found to be "the primary First Amendment problem" with contribution limitations. *Id.* at 24. Because the Court, in the *Buckley* opinion, treated freedom of association as subject to greater abridgement than freedom of speech, it generally upheld the contribution limitations established by the Federal Election Campaign Act of 1971, 26 U.S.C. §§ 9001 et seq. (1988), but it rejected that Act's ex-

penditure limitations as unconstitutional. See *Federal Election Comm'n ·v. National Conservative Political Action Comm.*, 470 U.S. 480, 491 (1985).

The distinction between contributions and expenditures set out in the *Buckley* opinion does not take us far in the present context.[2] In the *Buckley* case, the contribution limits were "limitation[s] upon the amount that any one person or group may contribute to a candidate or political committee." *Id.* at 20. The Bill is different, in that it places an aggregate limit on the total contributions that may be received in nonelection years.[3] A cap on total contributions in those years obviously also limits expenditures if the candidate's personal funds are

---

[2]Despite the reaffirmation of the distinction in *Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238 (1986), it had been questioned by some Justices of the Court, see *Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 509-512 (1985) (White, J., dissenting) (advocating similar limits on expenditures and contributions); *id.* at 518-521 (Marshall, J., dissenting) (same); *California Medical Ass'n v. Federal Election Comm'n*, 453 U.S. 182, 201-202 (1981) (Blackmun, J., concurring in part and in the judgment) (advocating full First Amendment protection for contributions and expenditures), and by a commentator, see L.H. Tribe, American Constitutional Law § 13-29, at 1145 (2d ed. 1988) ("While this distinction has always seemed problematic, it should by now have become clear that it is ripe for complete reassessment by the Court"). The distinction could be subject to refinement or reformulation by the present Court.

[3]The Legislature has also enacted limits on contributions to candidates "in any calendar year." G. L. c. 55, § 7A (*a*) (1), inserted by St. 1994, c. 43, § 27. The Bill could therefore have the effect of limiting candidates with large campaign funds to the receipt of a small election-year contribution or contributions from any given contributor, while candidates who had not exceeded the Bill's limits could receive contributions each year. This could itself create a constitutional problem. See *Service Employees Int'l Union v. Fair Political Practices Comm'n*, 955 F.2d 1312, 1316-1321 (9th Cir.) (striking down fiscal-year contribution limitations as discriminatory, based on factual finding that challengers, unlike incumbents, raised little money in the early years of the election cycle), cert. denied, 505 U.S. 1230, and cert. denied sub nom. *Kopp v. Service Employees Int'l Union*, 505 U.S. 1230 (1992); *State v. Dodd*, 561 So. 2d 263, 267 (Fla. 1990) (rejecting as unconstitutional a ban on contributions during legislative sessions, and noting that such a ban could disadvantage challengers "dependent on a steady trickle of small campaign contributions" relative to incumbents who can "simply wait until the money flows again").

restricted and the candidate has carried over little or no funds from a prior election year.[4] The Bill's provisions thus have the effect of determining the amount of contributions a candidate may receive, and will, in certain circumstances, also place limits on expenditures.

We next state the United States Supreme Court's standards for review of campaign finance legislation. As has been noted, the Court has said that the restrictions on freedom of association imposed by contribution limitations are subject to a less strict standard than are the burdens placed on speech by the expenditure limitations. Specifically, in discussing contribution limitations in the *Buckley* opinion, the Court said that interference with freedom of political association "may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Buckley* v. *Valeo, supra* at 25. In contrast, the Court said that expenditure limitations must "satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.* at 44-45. That statement refers to a requirement that such limitations must be "narrowly tailored to serve a compelling state interest." *Austin* v. *Michigan Chamber of Commerce*, 494 U.S. 652, 657 (1990).[5]

---

[4]In an advisory opinion, the Supreme Court of New Hampshire concluded that a law limiting campaign contributions to amounts proportional to the number of qualified voters would be unconstitutional, on the ground that the difference between such a limit and a limit on expenditures "is one of form, not of substance." *Opinion of the Justices*, 121 N.H. 434, 437 (1981). See *Gard* v. *Wisconsin Elections Bd.*, 156 Wis. 2d 28, 58 (1990) (concluding that law limiting only the total amount of contributions that a candidate can accept from *committees* is constitutional, citing *Buckley* v. *Valeo*, 424 U.S. 1, 38 [1976], in support of the proposition that in those circumstances the candidate could seek other sources of funds), cert. denied, 498 U.S. 982 (1990); 1987 Ariz. Op. Att'y Gen. 67 (same).

[5]The Bill may also have equal protection implications because it treats differently those candidates with large campaign funds and those without such funds. In the absence of any definitive discussion of this problem by the Supreme Court, we will assume that the standards in the equal protection area are the same as the standards applicable to restrictions on First Amendment rights because the statutory classification places burdens on both rights of expression and association. See *Austin* v. *Michigan Cham-*

Because the Bill places burdens on rights of expression and
association protected by the First Amendment, the burdens
can be upheld, under the standards just expressed, only, re-
spectively, if a compelling, or sufficiently important, State in-
terest justifies the imposition of the restriction and the means
used to protect that interest are "narrowly tailored," or
"closely drawn," to avoid interference with the affected con-
stitutional rights. It has been suggested that two compelling
State interests are promoted by the Bill — the prevention of
corruption, or its appearance, and the improvement of the
political process by equalizing amounts of campaign funds,
thus possibly encouraging potential candidates to challenge
incumbents. We discuss each interest in turn.[6]

The Supreme Court has said that "preventing corruption
or the appearance of corruption are the only legitimate and
compelling government interests thus far identified for re-
stricting campaign finances." *Federal Elections Comm'n* v.
*National Conservative Political Action Comm., supra* at
496-497. The concerns usually raised in connection with cor-
ruption, or its appearance, center on the notion that contribu-
tions may be given as a quid pro quo for favorable action or
treatment by a candidate presently serving or seeking elec-
tion, and a fear that the candidate with substantial funds
might use those funds for personal benefit or for purposes
other than lawful campaign expenditures.

---

*ber of Commerce,* 494 U.S. 652, 666 (1990) ("Because the right to engage
in political expression is fundamental to our constitutional system, statu-
tory classifications impinging upon that right must be narrowly tailored to
serve a compelling governmental interest").

[6]Despite an invitation for briefs on the issues raised by the questions
posed by the House of Representatives, no briefs from any of the invitees
were submitted. A letter was submitted by Common Cause/Massachusetts
commenting in general terms on the Bill. The comments did not endorse
the Bill, but requested that we limit our comments strictly to the Bill and
not address the "[S]tate interest involved in limiting campaign war chests"
without a "find[ing] that the [S]tate has a compelling interest in address-
ing this serious problem." Our responses, as they must be in this context,
are directed only to the Bill and the current state of Federal constitutional
law.

As to the concern that contributions will be made for the purpose of affecting a candidate's stance on a particular issue or matter, it is apparent that the Bill is not narrowly tailored to guard against this possibility or the perception that such conduct is commonplace. The carry-over provision, which permits an elected official to retain and use funds raised during an election year, defeats any contention that the Bill's caps on contributions effectively and narrowly address the issue of possible misuse of excess campaign funds. The concern regarding improper use of funds may be more efficiently addressed by legislation specifically delineating permissible campaign expenditures and providing for effective enforcement.

By limiting the amounts that may be raised in nonelection years, the Bill, as we have said, also has the potential effectively to restrict the amount that can be expended in those years. Unless a candidate has personal wealth available, he or she will be confined, in nonelection years, to spending only what has been carried over or what has been raised up to the limits set by the Bill. As a result of the Bill's structure, a candidate for a two-year office would face a limitation on expenditures every other year. A candidate for a four-year office would face expenditure limitations in three out of every four years. In any of the nonelection years, the candidate might wish, or have reason, to spend in excess of the off-year limitation to promote his or her candidacy or office, to deliver other political messages to the electorate, or to engage in other lawful political activities.[7] In the *Buckley* opinion, the Court struck down as unconstitutional campaign expenditure provisions which established amounts that could be spent in pursuit of particular Federal elective offices. While the Bill does not explicitly set expenditure ceilings, its provisions could have the practical effect of doing so in nonelection

---

[7] In the context of an advisory opinion, we lack an empirical basis for determining whether a candidate or an elected official might desire to spend in excess of the contribution ceilings in a nonelection year. There are, however, permissible uses for campaign funds in nonelection years in addition to early campaigning.

years. An interest in alleviating corruption, or its appearance, cannot justify limits on the quantity of political expression. *Buckley* v. *Valeo, supra* at 55-57 ("The First Amendment denies government the power to determine that spending to promote one's political views is wasteful, excessive, or unwise. In the free society ordained by our Constitution it is not the government, but the people — individually as citizens and candidates and collectively as associations and political committees — who must retain control over the quantity and range of debate on public issues in a political campaign").[8]

Further, by effectively precluding contributions to candidates or elected officials who have carried over the maximum permissible amount in campaign funds, the Bill could wholly prevent potential contributors from offering support to a candidate prior to the election year. "A contribution serves as a general expression of support for a candidate . . . [and] serves to affiliate a person with a candidate." *Buckley* v. *Valeo, supra* at 21-22. While a limitation on the *amount* of a contribution has been considered permissible, see *id.* at 20-21, legislation that has the effect of prohibiting a contributor from expressing support and affiliation with a candidate for a lengthy period constitutes a significant interference with the right of association. A contributor might have compelling reasons for desiring to express that support at a particular time other than the year of the election. The interest in avoiding corruption, and its appearance, cannot justify what

---

[8]It also has been suggested that the Bill's provisions might be justified as a means of preventing, in effect, the circumvention of contribution limitations, which are designed to prevent a single donor from exercising undue influence over a candidate. Repeated large contributions by a single donor, carried over year to year, might be viewed as avoiding the intent of the annual limit on single donor contributions. Provisions that limit the amount that may be raised in a nonelection year might, at least in some cases, eliminate the possibility of large annual donations from a single source that can be accumulated in anticipation of election campaigning. It is clear, however, that the Bill's provisions are not narrowly tailored to support limits on single donor contributions, an issue which is properly addressed by contribution limitations and disclosure requirements.

will amount, in some cases, to an outright ban on a contributor's right to express support for a candidate.

Finally, we note that the Bill's restriction on contributions to a candidate who has amassed the permissible limit in funds prior to the election year falls on those who would choose *currently* to contribute, and it does so on the basis of funds *previously* accumulated by the candidate, perhaps in a past election cycle. It could be the case then, that contributions given to a candidate in one election, when the candidate was opposing A, would be retained and used in a later election, when the candidate was opposing B. Yet a contributor who preferred the candidate to A, might not prefer the candidate to B. The Bill could restrict the freedom of association of current potential contributors, in favor of past contributors, who might not even choose currently to associate with the candidate. We think that this result further frustrates the right to freedom of association.

The second State interest advanced for the Bill, that of equalizing the funds available to candidates for expressive purposes to encourage more competitive elections, has been expressly disapproved by the Supreme Court. "[T]he concept that government may restrict the speech of some elements of our society [incumbents] in order to enhance the relative voice of others [prospective challengers] is wholly foreign to the First Amendment, which was designed 'to secure "the widest possible dissemination of information from diverse and antagonistic sources," ' and ' "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." ' *New York Times Co.* v. *Sullivan*, [376 U.S. 254,] 266, 269 [1964], quoting *Associated Press* v. *United States*, 326 U.S. 1, 20 (1945), and *Roth* v. *United States,* [354 U.S. 476,] 484 [1957]. The First Amendment's protection against governmental abridgment of free expression cannot properly be made to depend on a person's financial ability to engage in public discussion." *Buck-*

*ley* v. *Valeo, supra* at 48-49. The Bill may not be justified on this basis.[9]

Accordingly, for the reasons explained above, the Justices conclude that the Bill, if enacted into law, would, under current decisions of the United States Supreme Court, violate rights of free expression and association guaranteed by the First Amendment to the United States Constitution, and, therefore, we answer Question 1, "Yes."

2. Question 2 asks whether the Bill would violate the protections of free expression and association granted by art. 16, as amended by art. 77 of the Amendments, and art. 19 of the Massachusetts Declaration of Rights. We have considered these protections as comparable to those guaranteed by the First Amendment and have said that a burden placed on these protections can be justified only when a compelling State interest can be shown in the imposition of the restriction. See *Associated Indus. of Mass.* v. *Attorney Gen., ante* 279, 289 & n.8 (1994); *First Nat'l Bank* v. *Attorney Gen.,* 371 Mass. 773, 792 (1977), rev'd on other grounds sub nom. *First Nat'l Bank* v. *Bellotti,* 435 U.S. 765 (1978). Because we have concluded that the Bill would violate the First Amendment, we need express no opinion on the second question regarding the Bill and the protections afforded by arts. 16 and 19. See *Opinion of the Justices,* 396 Mass. 1211, 1214 n.1 (1985). Our answer to the House on Question 2, therefore, is "Not answered."

---

[9]In *Austin* v. *Michigan Chamber of Commerce,* 494 U.S. 652 (1990), and in *Federal Election Comm'n* v. *National Right to Work Comm.,* 459 U.S. 197 (1982), the Court upheld provisions controlling and limiting corporations' political contributions. The Court has recognized that a State may have a compelling interest in regulating corporate contributions because of the special characteristics of the corporate structure, and the fact that the resources available to a corporation "are not an indication of popular support for the corporation's political ideas." *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 258 (1986). In *Austin, supra* at 665, the Court stressed that its decision depended not on the wealth of potential corporate contributors, "but on the unique state-conferred corporate structure." See also *Federal Election Comm'n* v. *National Conservative Political Action Comm.,* 470 U.S. 480, 495-496 (1985). These cases have no application to the Bill before us.

The foregoing answers and opinion are submitted by the Chief Justice and the Associate Justices subscribing hereto on the twenty-eighth day of July, 1994.

PAUL J. LIACOS
HERBERT P. WILKINS
RUTH I. ABRAMS
JOSEPH R. NOLAN
NEIL L. LYNCH
FRANCIS P. O'CONNOR
JOHN M. GREANEY