TOWN OF MOUNT WASHINGTON *vs.* FREDERIC W. COOK.

FRANK H. WRIGHT *vs.* SAME.

Berkshire.    October 5, 9, 1934. — October 11, 1934.

Present: RUGG, C.J., CROSBY, PIERCE, FIELD, & DONAHUE, JJ.

*Constitutional Law*, Referendum.

Ten voters signed and filed with the Secretary of the Commonwealth a document in which they stated that they petitioned "for a referendum on a" certain law "and ask for the repeal of the said law, the same being an emergency law. This petition is filed under the provisions of the Constitution of Massachusetts as set forth in the

Articles of Amendment XLVIII relating to The Referendum III section 4." The Secretary thereupon furnished blanks for subsequent signers which contained a copy of the document signed by the first ten voters together with their names and residences, followed by the requisite description of the emergency law, and, with appropriate headings for names and residences, space for the subsequent signers. Ten thousand voters signed such blanks. *Held,* that the blanks signed by the ten thousand voters sufficiently completed the petition of the ten within the requirements of "The Referendum" "III. Referendum Petitions," § 4 of art. 48 of the Amendments to the Constitution of the Commonwealth, although the blanks did not contain in terms a statement that the ten thousand were "protesting against such law."

The meaning of the words in "III. Referendum Petitions" § 2 of art. 48 of the Amendments to the Constitution of the Commonwealth, that a law, "the operation of which is restricted to a particular town, city or other political division or to particular districts or localities of the commonwealth," is a matter which is excluded from the operation of a referendum petition, is that such a restriction must be specified in the law itself in terms which expressly or by fair implication are geographically descriptive of territorial divisions of the Commonwealth.

A law which is general in its operation throughout the Commonwealth but which may by local option be suspended in territorial divisions is not such an excluded matter.

St. 1934, c. 275, is not such an excluded matter, but is subject to referendum under said § 4.

Two PETITIONS, filed in the Supreme Judicial Court for the county of Berkshire on September 28, 1934, for writs of mandamus.

The petitions were heard by *Lummus,* J., who ordered them dismissed as a matter of law and reported the cases for determination by the full court.

*F. H. Wright & H. N. Joyner,* for the petitioners.

*E. T. Simoneau,* Assistant Attorney General, for the respondent.

RUGG, C.J. These are petitions for writs of mandamus to compel the respondent not to submit St. 1934, c. 275, on referendum at the approaching State election. That statute regulates the use of traps for the capture of fur-bearing animals and, by its preamble, was declared to be an emergency law.

I. It is contended that the referendum petition signed by the requisite number of qualified voters and duly filed with

the respondent has not been completed as required by "The Referendum" "III.   Referendum Petitions," § 4 of art. 48 of the Amendments to the Constitution of the Commonwealth.  The contention is based on the words of that section as applied to the undisputed facts.  The words of that section pertinent to the present controversy are these: "A referendum petition may ask for the repeal of an emergency law . . . . Such petition shall first be signed by ten qualified voters of the commonwealth, and shall then be filed with the secretary of the commonwealth . . . . The secretary of the commonwealth shall provide blanks for the use of subsequent signers, and shall print at the top of each blank a description of the proposed law as such description will appear on the ballot together with the names and residences of the first ten signers.  If such petition filed as aforesaid is completed by filing with the secretary of the commonwealth . . . the signatures of not less than ten thousand qualified voters of the commonwealth protesting against such law and asking for a referendum thereon, then the secretary of the commonwealth shall submit such law to the people at the next state election . . . ."  The section thus prescribes that the "referendum petition" to be filed by the first ten voters "may ask for the repeal of an emergency law," while the completing petition must be signed by not less than ten thousand voters "protesting against such law and asking for a referendum thereon."

The undisputed facts are that the initial referendum petition signed by the ten voters states that they "petition for a referendum on a law," being St. 1934, c. 275, "and ask for the repeal of the said law, the same being an emergency law.  This petition is filed under the provisions of the Constitution of Massachusetts as set forth in the Articles of Amendment XLVIII relating to The Referendum III section 4."  The blanks provided by the Secretary of the Commonwealth for the subsequent signers respecting the referendum contained a copy of the petition signed by the first ten voters together with their names and residences, followed by the requisite description of the emergency law. Then, with appropriate headings for names and residences,

were blanks for the subsequent signers. (Although not printed in the record, a sample blank was presented at the argument by agreement of all counsel.) The ten thousand voters signing the completing petition, therefore, signed the same petition as the first ten voters. They signed nothing which contained the precise words "protesting against such law." They simply indorsed by their signatures the form signed by the first ten voters petitioning for a referendum on the specified law and asking for its repeal pursuant to § 4 of "III. Referendum Petitions" of art. 48 of the Amendments.

The exact question is whether those voters, attempting by their signatures to complete the petition for a referendum, subscribed a petition conforming to the requirements of the amendment. An amendment to the Constitution is an important and solemn instrument. It commonly is a statement of general principles. There is considerable of detail about art. 48. It nevertheless must be construed as a part of the Constitution. Rules established for the interpretation of the Constitution in general must be followed. Art. 48 was framed with great care. All its words must be presumed to have been chosen advisedly. They must be given their ordinary meaning, and construed to accomplish a reasonable result. Mere words are not to be placed above the plain purpose to be achieved. The aim of all interpretation is to give effect to the dominating idea of the instrument. Statements in the Constitution and its Amendments must be given effect in consonance with the end they are designed to accomplish. *Attorney General* v. *Methuen,* 236 Mass. 564, 573, 576. *Brooks* v. *Secretary of the Commonwealth,* 257 Mass. 91, 99. In *Opinion of the Justices,* 271 Mass. 582, 589, respecting another part of art. 48 of the Amendments, it was said that its provisions "are mandatory and not simply directory. They are highly important. There must be compliance with them." In *United States* v. *Sprague,* 282 U. S. 716, at page 731, occurs this statement: "The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning;

where the intention is clear there is no room for construction and no excuse for interpolation or addition."

The voters who affixed their signatures to the completing petition here assailed expressed a definite intention. Indubitably they petitioned for a referendum on the statute and asked for its repeal. They stated that their petition was filed under the provisions of art. 48 of the Amendments, "The Referendum III section 4." Thus they attempted to incorporate by reference the essential provisions of that section so far as it affected them and their procedure. Their petition did not contain the words prescribed by that section that they were "protesting against such law." It is contended that the omission of those words is fatal to the petition. The point is difficult. It would have been much better if the completing petition had followed in its phraseology the words of the Amendment to the Constitution.

There is a distinction between the requirements of "III. Referendum Petitions" in § 3 respecting a referendum upon a law which has not become effectively operative (*Rosenthal* v. *Liss*, 269 Mass. 373), and in § 4 respecting a referendum upon a law which has become effectively operative. By § 3 a "petition asking for a referendum on a law, and requesting that the operation of such law be suspended" must be signed and filed. Obviously, the essentials of such a petition are different from those of § 4, where the initial ten signers of the referendum petition must "ask for the repeal of an emergency law" and where the completing petition must be signed by the requisite number of voters "protesting against such law and asking for a referendum thereon." The provisions of § 4 set forth a firmer persuasion and more settled purpose on the part of signers of the referendum petition than do those of § 3. Signers of a petition under § 4 must not simply ask for a referendum upon a law, they must also give pledge in writing for the public files that they are utterly opposed to the substance of the law. To sign a petition for the repeal of a law shows hostility to the law amounting to protest against it. With reference to the law, the signing of such a petition is a declaration of condemnation; it is a strong expression of disapproval; it is a grave affirmation of extreme aversion;

it is a formal avowal of adverse opinion; it is assertion of settled desire to annul. The statement signed by those subscribing the completing petition in the cases at bar does not bear indication of thoughtlessness or inattention. Its words given due weight and fair interpretation import deliberate determination to abrogate the law in the way provided by art. 48 of the Amendments; they imply deep personal conviction, based upon a grounded belief that the law is contrary to the public welfare. The blanks for the signatures of voters subsequent to the first ten were provided by the Secretary of the Commonwealth. No other blanks could be used. No reasonable voter, mindful of the contents of the petition, could be misled as to the substance and effect, the meaning and purpose, of what he was signing. No one else could be under misapprehension on that subject.

The proceedings of the constitutional convention of 1917–1918, when art. 48 of the Amendments was approved and voted to be submitted to the people, have been examined with care. *Yont* v. *Secretary of the Commonwealth*, 275 Mass. 365, 369. Thus it appears that the original draft of the amendment contained the same provision now found in § 4, that those desiring a referendum on an emergency law must sign a petition "protesting against such law." It contained no provision for an initial petition signed by ten voters. That was inserted later. The debates of the convention, so far as we are able to discover, throw no light upon the meaning of the words here in question. The arrangement of art. 48 carries some suggestion that the initial ten signers of a petition, either for an initiative or for a referendum, are leaders in the movement and go at least as far in its support as the subsequent signers. See art. 48, "The Initiative. II. Initiative Petitions," § 3. The requirement that the initial petition for referendum under "III. Referendum Petitions," § 4, signed by ten voters must ask for the repeal of the law is an implication that such request includes a protest against the law. Signers of the completing petition would not naturally be required to be more emphatic in disapproval of the law than the ten signers of the original petition. All these

considerations lead us to the conclusion, that the supporting petition is not fatally defective, but is in compliance with the constitutional mandate that voters on the completing petition must append their signatures to something "protesting against" the law. To reach the opposite result would be to exalt the letter of the Constitution above its animating spirit.

II. The next contention is that the referendum petition is invalid because St. 1934, c. 275, falls within matters excluded from the operation of a referendum petition in that it is a law "the operation of which is restricted to a particular town, city or other political division or to particular districts or localities of the commonwealth." "III. Referendum Petitions," § 2 of art. 48 of the Amendments. The law in question is general in its terms. When enacted as an emergency law it became immediately operative throughout the Commonwealth. It contains a provision, however, that in the several cities and towns there may be submitted to popular vote at a regular municipal election the question whether the operation of the law (§ 105B, inserted in G. L. [Ter. Ed.] c. 131) shall be suspended within their respective boundaries. If a majority of the votes cast are in the affirmative, the law shall be suspended within such city or town unless and until changed by vote at some subsequent election. The law also authorizes the commissioner of conservation to suspend for not exceeding thirty days the operation of the law (§ 105B) within any specified territory under the control of the department of conservation. The law further empowers the selectmen of any town, pursuant to petition, to call a special town meeting during the current year for the purpose of voting on the question of suspending the operation of the law (§ 105B) in that town. *Opinion of the Justices*, 286 Mass. 611. In one town at least such special town meeting has been held during the current year and the operation of the law has been suspended.

The law in question in its general characteristics is a local option law. It contains no exceptions nor provisions restricting its operation to a particular town, city or other political division or to particular districts or localities. The machinery

for exercising its local option features could not be put in motion even in the towns during the current year except after the lapse of some time. G. L. (Ter. Ed.) c. 39, § 10. The power conferred upon the commissioner of conservation is one of very limited suspension and, in the nature of things, can be exercised by a conscientious official only after investigation and deliberation. In any event, even after suspension in one or numerous contiguous or separated towns and cities, the law continues to be operative. It may be reinstated and made practically effective at any time by the same means by which it became suspended in such towns and cities.

The meaning of the words of the amendment (already quoted and invoked in support of this contention), speaking broadly, is that the restriction to a particular town, city or other political subdivision or to particular districts or localities must be specified in the law itself in terms which expressly or by fair implication are geographically descriptive of territorial divisions of the Commonwealth, in order that the law be an excluded matter. *Opinion of the Justices*, 261 Mass. 523, 553, 554. *Christian* v. *Secretary of the Commonwealth*, 283 Mass. 98. *Opinion of the Justices*, 254 Mass. 617. A law which is general in its operation but which may by local option be suspended in territorial divisions is not an excluded matter. Such a law recognizes differences in local preferences and gives opportunity for their expression from time to time; it does not of itself establish the localities and mark out the restrictions.

It becomes unnecessary to consider whether the town of Mount Washington is a proper party to bring a petition of this nature. See *Chelsea* v. *Treasurer & Receiver General*, 237 Mass. 422, 432.

It follows that the rulings of law made by the single justice were correct. The orders dismissing the petitions were right.

In each case the entry may be

*Order dismissing petition affirmed.*