NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12063

TIMOTHY BOGERTMAN & others[1] vs. ATTORNEY GENERAL & another.[2]


Suffolk.      May 2, 2016. - June 28, 2016.

Present:  Gants, C.J., Spina, Botsford, Duffly, Lenk, & Hines,
JJ.


Initiative.  Constitutional Law, Initiative petition.  Attorney
General.  Gaming.


Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on December 7, 2015.

The case was reported by Cordy, J.


Matthew S. Cameron for the plaintiffs.
Elizabeth N. Dewar, Assistant State Solicitor, for the
defendants.
Jeffrey S. King & Hayley Trahan-Liptak, for Eugene McCain,
amicus curiae, submitted a brief.


GANTS, C.J.  In this appeal, we decide whether the Attorney

General properly certified an initiative petition that seeks to

_____

[1] Matthew Cameron, Joseph Catricala, Meagan Catricala, Brian
Gannon, Jesse Kollins, Gail Miller, Celeste Myers, Sandra Nijar,
and John Ribeiro.

[2] Secretary of the Commonwealth.

amend G. L. c. 23K to authorize the Gaming Commission (commission) to award one additional license for a slot machine parlor. Article 48 of the Amendments to the Massachusetts Constitution, which governs the process for presenting proposed laws directly to Massachusetts voters through popular initiatives, sets forth certain standards for initiative petitions. In this case, the plaintiffs contend that the petition violates two of art. 48's restrictions, which prohibit initiative petitions that are (1) limited to local matters, or (2) substantially the same as those presented at either of the two preceding biennial State elections. See art. 48, The Initiative, II, §§ 2, 3, of the Amendments to the Massachusetts Constitution, as amended by art. 74 of the Amendments. We conclude that the petition complies with these provisions and was therefore properly certified by the Attorney General.

Background. In 2011, the Legislature enacted the Expanded Gaming Act, St. 2011, c. 194, which established the commission and a highly structured process for introducing, licensing, and regulating casino and slots gambling in the Commonwealth under a new statute, G. L. c. 23K. See Abdow v. Attorney Gen., 468 Mass. 478, 480-483 (2014) (describing Expanded Gaming Act). Chapter 23K authorizes the commission to award up to three "category 1" licenses for gaming establishments "with table games and slot machines" (i.e., casinos) in certain specified

regions of the Commonwealth, and no more than one "category 2" license for a gaming establishment "with no table games and not more than 1,250 slot machines" (i.e., a slots parlor). See G. L. c. 23K, § 2 (defining category 1 and 2 licenses); G. L. c. 23K, § 19 (a) (specifying number and regional locations of category 1 licenses); G. L. c. 23K, § 20 (a) (specifying number of category 2 licenses). Chapter 23K also requires the commission to request applications for category 2 slots parlor licenses before requesting applications for category 1 casino licenses. See G. L. c. 23K, § 8 (a).

On August 5, 2015, the proponent, Eugene McCain,[3] filed an initiative petition for "An Act relative to expanded gaming," (petition 15-34 or petition), pursuant to art. 48.[4] This petition seeks to amend G. L. c. 23K in two ways. First, the petition would amend G. L. c. 23K, § 20, by adding a new subsection (g) that would authorize, but not require, the commission to award one additional category 2 slots parlor license to a qualified applicant, but only for a location that meets the following qualifications:

> "The proposed location of the gaming establishment shall be at least 4 acres large, and shall be adjacent to, and within 1500 feet of, a race track, including the track,

---

[3] We acknowledge the amicus brief submitted by Eugene McCain.

[4] The full text of petition 15-34 is set out in the Appendix.

grounds, paddocks, barns, auditorium, amphitheatre and/or bleachers, if any, where a horse racing meeting may physically be held, which race track shall have hosted a horse racing meeting, provided that said location is not separated from said race track by a highway or railway."

Second, the petition would eliminate the timing requirement in G. L. c. 23K, § 8, so that the commission may solicit applications for a category 2 slots parlor license concurrently with or after the solicitation of applications for category 1 casino licenses.[5]

In a letter to the Secretary of the Commonwealth (Secretary) dated September 2, 2015, the Attorney General certified that

"this measure is in proper form for submission to the people; that the measure is not, either affirmatively or negatively, substantially the same as any measure which has been qualified for submission or submitted to the people at either of the two preceding biennial state elections; and that it contains only subjects that are related or are mutually dependent and which are not excluded from the initiative process pursuant to Article 48, the Initiative, Part 2, Section 2."

On December 7, 2015, the plaintiffs, ten registered voters and residents of Suffolk County, commenced an action against the Attorney General and the Secretary in the county court, seeking

---

[5] Specifically, the proposed amendment would delete the first sentence from G. L. c. 23K, § 8 (a), which currently states:  "The commission shall issue a request for applications for category 1 and category 2 licenses; provided, however, that the commission shall first issue a request for applications for the category 2 licenses."  The amendment would replace the deleted language with a new sentence that simply states, "The commission shall issue a request for applications for category 1 and category 2 licenses."

relief in the nature of certiorari and mandamus under G. L. c. 249, §§ 4 and 5, and requesting declaratory relief under G. L. c. 231A. The plaintiffs allege in their complaint that the petition concerns an excluded local matter in violation of art. 48, because it would "restrict the newly-available license to gaming establishment proposals in the immediate vicinity of Suffolk Downs, a thoroughbred horse racing track which spans two municipalities (Boston and Revere) in Suffolk County." In connection with that allegation, the plaintiffs submitted a September 12, 2015, Boston Globe article reporting that McCain, "the man who is driving the campaign" for the initiative petition, had an agreement to buy a mobile-home property near Suffolk Downs in Revere. According to the article, McCain raised with Revere officials the prospect of putting slot machines at the site, although the city did not support the proposal. The plaintiffs also allege that the petition violated art. 48's prohibition on presenting "substantially the same" measure as had been proposed within the two preceding biennial State elections, because in the November, 2014, election the voters had considered ballot question 3, entitled "Expanding Prohibitions on Gaming."

On February 25, 2016, a single justice of the county court reserved and reported the case for determination by this court.

Discussion. Article 48 of the Amendments to the Massachusetts Constitution establishes the process and standards for enactment of a law by "popular initiative, which is the power of a specified number of voters to submit constitutional amendments and laws to the people for approval or rejection." Art. 48, I. Article 48 requires that, before the proponents of an initiative petition can start the process of soliciting signatures from additional voters, submitting the petition to the Legislature for possible action, and placing it on the ballot, they must submit the petition by a certain date to the Attorney General for review. Art. 48, The Initiative, II, § 3, as amended by art. 74. The Attorney General must then decide whether to

> "certify that the measure and the title thereof are in proper form for submission to the people, and that the measure is not, either affirmatively or negatively, substantially the same as any measure which has been qualified for submission or submitted to the people at either of the two preceding biennial state elections, and that it contains only subjects not excluded from the popular initiative and which are related or which are mutually dependent."

Id. If the Attorney General certifies that the initiative petition meets these criteria, and the proponents submit the required number of additional signatures of qualified voters to the Secretary by a certain date, the Secretary will then transmit the initiative petition to the House of Representatives for consideration. See id. § 4; art. 48, The Initiative, V,

§ 1, as amended by art. 81 of the Amendments to the Massachusetts Constitution; Lincoln v. Secretary of the Commonwealth, 326 Mass. 313, 317-318 (1950).  If the Legislature fails to enact the proposed law by a certain date,[6] and the proponents succeed in obtaining and timely submitting the required number of further additional signatures, then the Secretary will submit the initiative petition to the voters at the next State election.  Art. 48, The Initiative, V, § 1, as amended by art. 81.

Thus, the Attorney General acts as the gatekeeper for the initiative process, ensuring that a proposed petition meets certain constitutional requirements before it can be submitted to the Legislature and the voters.  The Attorney General's review does not involve, however, an "inquiry into [the] substance" of a proposed measure; she is to be "not the censor, but the aid and interpreter of the people's will," allowing "the people [to] speak freely," with "as little restraint as possible."  Nigro v. Attorney Gen., 402 Mass. 438, 446-447 (1988), quoting 2 Debates in the Massachusetts Constitutional Convention 1917-1918, at 728 (1918) (Constitutional Debates).

---

[6] The legislative process is somewhat different for constitutional amendments proposed in an initiative petition. See art. 48, The Initiative, IV, §§ 1-5, of the Amendments to the Massachusetts Constitution, as amended by art. 81 of the Amendments.

See Yankee Atomic Elec. Co. v. Secretary of the Commonwealth, 403 Mass. 203, 211 (1988) (Yankee II).

We have long held that "the certificate of the Attorney General" concerning an initiative petition "is open to inquiry as to its conformity to the Constitution in appropriate proceedings." Horton v. Attorney Gen., 269 Mass. 503, 508 (1929). We review the Attorney General's certification of an initiative petition de novo, Abdow, 468 Mass. at 487, "consider[ing] anew what facts are implicit in the language of the petition or are subject to judicial notice, but . . . defer[ring] to the Attorney General's reasonable determinations concerning facts subject to [her] official notice,"[7] Associated Indus. of Mass. v. Attorney Gen., 418 Mass. 279, 286 (1994). In undertaking our review, we also bear in mind "the firmly established principle that art. 48 is to be construed to support the people's prerogative to initiate and adopt laws." Abdow, supra, at 487, quoting Carney v. Attorney Gen., 451 Mass. 803, 814 (2008) (Carney II). We do not weigh the wisdom of the policies underlying a proposed measure, but only whether the petition conforms to the constitutional requirements of art. 48. See Buckley v. Secretary of the Commonwealth, 371 Mass. 195, 202-203 (1976).

---

[7] See part 1.c, infra, for further discussion of official notice.

1. <u>Local matters exclusion</u>. Article 48 provides that "[n]o measure . . . the operation of which is restricted to a particular town, city or other political division or to particular districts or localities of the commonwealth . . . shall be proposed by an initiative petition." Art. 48, The Initiative, II, § 2. The plaintiffs contend that petition 15-34 violates this "local matters" exclusion because the petition is so narrowly drawn that only one existing site in the Commonwealth could meet its specifications while also being legally eligible for a new slots parlor license. Our review of the Attorney General's certification of the petition is informed by the general principle favoring certification of proposed initiatives: "unless it is <u>reasonably clear</u> that a proposal contains an excluded matter, neither the Attorney General nor this court on review should prevent the proposal from appearing on the ballot" (emphasis added). <u>Associated Indus. of Mass</u>., 418 Mass. at 287.

a. <u>Purpose and scope</u>. We begin by reviewing the purpose and scope of the local matters exclusion in art. 48. "The purpose of the local matters exclusion is to ensure that only matters of Statewide concern are put before the voters in an initiative petition," because "[m]atters of purely local or regional concern are not appropriately decided by all Massachusetts voters." <u>Abdow</u>, 468 Mass. at 496, citing <u>Carney</u>

II, 451 Mass. at 811.  See Thompson v. Attorney Gen., 413 Mass. 21, 23 (1992); Massachusetts Teachers Ass'n v. Secretary of the Commonwealth, 384 Mass. 209, 224 (1981).  As stated by a member of the committee on initiative and referendum that proposed art. 48 during the Massachusetts constitutional convention of 1917-1918:

> "Under the heading 'Excluded Matters', . . . the intention was to exclude purely local matters, matters that were not State wide matters.  A matter relating to a city or town should be dealt with by the Legislature or by that city or town, or by the Legislature referred to that city or town. It is clear that a matter referring to a particular city is not a matter of State wide interest that should be dealt with by the State wide initiative and referendum."

Constitutional Debates, supra at 693 (comments of Joseph Walker of Brookline).[8]  In discussing the language of the local matters exclusion, Walker distinguished between "[l]aws that relate to a particular district or locality" and those that relate "to the Commonwealth as a whole."  Id.  As these comments suggest, the local matters exclusion serves to prevent the entire Massachusetts electorate from deciding issues involving particular municipalities or other political subdivisions that

---

[8] "It is permissible to examine the debates of the Constitutional Convention for the purpose of ascertaining the views presented to the Convention and the understanding of its members, although the plain meaning of the words used in the Amendment cannot be thereby controlled."  Yont v. Secretary of the Commonwealth, 275 Mass. 365, 369 (1931).  See Buckley v. Secretary of the Commonwealth, 371 Mass. 195, 198-199 (1976).

do not concern them and that are more properly decided by the government or voters of those localities, or by the Legislature.

Our previous decisions concerning the local matters exclusion have distinguished between two types of petitions. Where "the restriction to a particular town, city or other political subdivision or to particular districts or localities [is] specified in the law itself in terms which expressly or by fair implication are geographically descriptive of territorial divisions of the Commonwealth," the petition is barred by the local matters exclusion. Mount Washington v. Cook, 288 Mass. 67, 74 (1934), cited with approval in Abdow, 468 Mass. at 497; Carney II, 451 Mass. at 811; Ash v. Attorney Gen., 418 Mass. 344, 348 (1994); and Massachusetts Teachers Ass'n, 384 Mass. at 224. For example, this court has advised the Legislature on many occasions that proposed laws were not proper subjects for an initiative or a referendum[9] where they explicitly targeted particular counties, regions, or municipalities. See, e.g., Opinion of the Justices, 334 Mass. 721, 724, 733, 743-744 (1956) (bill creating Massachusetts Port Authority to take over,

---

[9] Article 48 contains a local matters exclusion for referendum petitions that is nearly identical to the exclusion for initiative petitions. See art. 48, The Referendum, III, § 2. We therefore consider decisions applying the local matters exclusion to referendum petitions in deciding how to apply the local matters exclusion to initiative petitions. See Massachusetts Teachers Ass'n v. Secretary of the Commonwealth, 384 Mass. 209, 223 (1981).

finance, and operate Sumner tunnel in Boston, State-owned airports in East Boston and Bedford, Mystic River Bridge, and other port properties in Boston not subject to referendum due to local matters exclusion); Opinion of the Justices, 303 Mass. 615, 618, 626 (1939) (bill for establishment of representative districts in counties that did not apply to Dukes and Nantucket Counties, and that operated differently in Suffolk County, not subject to referendum due to local matters exclusion); Opinion of the Justices, 294 Mass. 607, 608, 609 (1936) (initiative proposal requiring taxicab stands only in cities improper due to local matters exclusion); Opinion of the Justices, 261 Mass. 523, 541, 554 (1927) (bill concerning Boston Elevated Railway Company not subject to referendum due to local matters exclusion, where assessment of costs and operation of bill were restricted to cities and towns where the railway operated).  See also Massachusetts Teachers Ass'n, supra at 223 (discussing application of local matters exclusion in these opinions).

Where the proposed laws concerned Statewide issues and, on their face, applied Statewide, we have held that initiative petitions were not barred by the local matters exclusion even though, in practice, the laws might affect some localities significantly more than others.  See Abdow, 468 Mass. at 497-498 (petition to prohibit various forms of gaming not barred by local matters exclusion, because it involved matter of Statewide

concern and applied Statewide, even though economic impact of Statewide ban would be greatest in existing or prospective host communities); Carney II, 451 Mass. at 810-813 (petition to eliminate parimutuel dog racing not barred by local matters exclusion, because it involved matter of Statewide concern and applied Statewide, even though opponents alleged it took "'dead aim' at the only two localities where dog racing . . . exist[ed] or [was] likely to exist in the foreseeable future"); Ash, 418 Mass. at 347-349 (petition to ban rent control not barred by local matters exclusion, because it applied Statewide and involved issue of Statewide concern, even though rent control was only in effect in small number of municipalities); Massachusetts Teachers Ass'n, 384 Mass. at 224-225 (Proposition 2½ not barred by local matters exclusion because it addressed matter of Statewide concern and applied in all areas of the Commonwealth, even though it had different consequences in various municipalities).

b. Application in this case. Applying these principles to petition 15-34, we note, first, that it falls within a subject matter area -- gaming -- that is regulated by the State, not by municipalities or other political subdivisions, and is plainly an issue of Statewide concern.[10] See Abdow, 468 Mass. at 497

_____

[10] The plaintiffs concede in their brief that "the general question of an additional gaming license might . . . be a

(proposal to prohibit casinos, slot machines, all games conducted under G. L. c. 23K, and parimutuel wagering was "plainly a matter of Statewide . . . concern"); Carney II, 451 Mass. at 806, 812-813 (proposal to eliminate parimutuel dog racing involved issue of Statewide concern, since it was regulated at State level); Commonwealth v. Wolbarst, 319 Mass. 291, 294-296 (1946) (discussing Commonwealth's "long established policy of dealing with gambling on a State wide basis"). Wherever the second slots parlor license might be awarded, its economic "impact would be Statewide."  See Abdow, supra at 498. The construction workers who would build such a slots parlor, the employees who would operate it, and the visitors who would play the slots would not be limited to those residing in the host community, and the tax revenues anticipated from its operation would benefit State coffers.  See id.  The adverse consequences of slots parlor gambling claimed by gambling opponents, "including an increase in those suffering the psychological, social, and economic effects of 'gambling disorder,' . . . and higher crime rates, if they were to occur," would also not be limited to the host community.  Id.  These factors support submission of the petition to the entire Massachusetts electorate.

---

suitable subject for a statewide ballot question in and of itself."

We further observe that, on its face, there is nothing in the language of the proposed law that explicitly refers, or restricts its operation, to any "particular town, city or other political division or to particular districts or localities of the commonwealth." Art. 48, The Initiative, II, § 2. To be sure, it contains a set of relatively narrow specifications: the location of the new slots parlor must be at least four acres large; it must be within 1,500 feet of a race track where a horse race may be physically held and in fact has been held; and it cannot be separated from the race track by a highway or railway. But on their face, these requirements do not refer to any particular geographical location, and the plaintiffs have not demonstrated why a developer could not create a new entertainment complex that meets these specifications at any one of many possible locations across the Commonwealth where horse races have been held or could be conducted, and then proceed to apply for the new slots parlor license.

We thus consider whether, even if the proposed law is not expressly limited to a particular locality, it contains terms that "by fair implication are geographically descriptive of territorial divisions of the Commonwealth," and thereby improperly restrict its application to local matters. Mount Washington, 288 Mass. at 74. The plaintiffs urge us to take judicial notice that the petition's "proponent Eugene McCain has

a property interest in land which . . . is the only site in the Commonwealth which meets these carefully-drafted specifications while also being legally eligible for a new license application" (footnote omitted). These asserted facts are not appropriate for judicial notice, and, even if they were, they would not suffice to show that the proposed law is limited to local matters.

We may take judicial notice of facts of common knowledge that are indisputably true. See Provencal v. Commonwealth Health Ins. Connector Auth., 456 Mass. 506, 515 n.16 (2010), citing Nantucket v. Beinecke, 379 Mass. 345, 352 (1979). See also Mass. G. Evid. § 201(b) (2016) ("The court may judicially notice a fact that is not subject to reasonable dispute because it [1] is generally known within the trial court's territorial jurisdiction or [2] can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

Here, it is certainly not a matter of common knowledge that McCain has an interest in a property that meets the specifications in the proposed law, still less that it is the only property in the Commonwealth that could meet those specifications while also being eligible for the proposed slots parlor license. Nor have the plaintiffs brought to our attention unimpeachable records that would unquestionably establish these alleged facts. Although the plaintiffs have

proffered a newspaper article in support of their claims, the article does not definitively state all of these allegations and, in any event, we must disregard it as hearsay.[11]  See Costa v. Fall River Hous. Auth., 453 Mass. 614, 628 (2009).

Nor can we say that all of the plaintiffs' allegations are indisputably true.  See Provencal, 456 Mass. at 515 n.16.  The record indicates that there is a dispute over how many locations with existing race tracks nearby might be eligible for a slots parlor license under the specifications in the proposed law.  As the plaintiffs stipulated, "[t]he proponent and opponents of petition 15-34, in their various memoranda on certification to the Attorney General, debated which, and how many, currently-existing race tracks in the Commonwealth could meet the specific site requirements set forth in the proposed law."  A memorandum submitted by counsel for the proponent asserts that the proposed siting criteria would "apply to at least [ten] municipalities containing horse race tracks scattered throughout the Commonwealth, which have already hosted horse racing meetings."  An opposition memorandum disputes that assertion, but presents

---

[11] The article states that "[t]he language of the ballot petition . . . seemed tailor-written for Suffolk Downs," and that McCain "has an agreement to buy the mobile-home property down the parkway from Suffolk Downs."  But it does not unequivocally state that the property meets the specifications in the proposed law or that it is the only property in the Commonwealth that would be eligible for the proposed slots parlor license.

specific arguments challenging only two of the potential sites listed.  Even the plaintiffs acknowledge in their brief that there are "three presently identifiable sites in the Commonwealth" -- Brockton Fairgrounds, Plainridge Park, and Suffolk Downs -- near which the proposed slots parlor might be located.  The plaintiffs argue that the Brockton Fairgrounds and Plainridge Park locations would not be eligible for the proposed slots license, leaving Suffolk Downs as the only possible choice, but those arguments are open to question.  The plaintiffs ask us to take notice that the city of Brockton has entered into an agreement under which the city has pledged to work with Mass Gaming & Entertainment, LLC, to support that entity's application for a category 1 casino license at the Brockton Fairgrounds.  But it appears that application was rejected by the commission on April 28, 2016.[12]  The plaintiffs also assert that Plainridge Park is already the holder of a category 2 license and therefore would not be eligible for a second license under G. L. c. 23K, § 23 (d).  But the proponent's memorandum argues that Plainville, the town where Plainridge Park is located, would not be excluded as a location

_____

[12] See Gaming Commission, Transcript, Public Meeting no. 188, vol. 3, at 121-122 (Apr. 28, 2016), http://massgaming.com/wp-content/uploads/Transcript-4-28-16-REGION-C-UPDATE.pdf [https://perma.cc/9QGF-PVCD].

by this provision; only the actual license holder or its affiliates would be barred from seeking a second license.

Even if we were to accept as true all of the plaintiffs' allegations that the petition's specifications would limit the slots parlor license to a single site among existing race tracks, i.e., Suffolk Downs, that still would not render the petition improper under the local matters exclusion because nothing would prohibit a developer from building a new race track in the Commonwealth, holding a horse race there (subject to licensing),[13] and then seeking to license an adjacent slots parlor that fits within the terms of the proposed law. Although we acknowledge that there might be considerable practical economic obstacles to such an undertaking, "[t]hat the present economic realities of the industry might make this prospect unlikely to materialize is irrelevant" (emphasis in original). Carney II, 451 Mass. at 812. The initiative petition does not run afoul of the local matters exclusion where the second slots parlor license it proposes could potentially be awarded to a site in many localities, even if it were most likely that it would be awarded to a site near Suffolk Downs. See id. at 810-812 (rejecting argument that proposed law outlawing dog racing

---

[13] The plaintiffs have not directed us to any limitation on the number of horse racing licenses available in the Commonwealth; nor are we aware of any. See G. L. c. 128A, § 2, as amended through St. 2011, c. 194, § 38.

should be excluded from initiative process because there were only two localities where dog racing currently existed or was likely to exist in foreseeable future).

The plaintiffs also contend that the initiative is improper because it automatically excludes all cities and towns that lack sufficient developable acreage to meet the size requirements of the proposed law. We do not find this argument persuasive. The four-acre size requirement is not prohibitively large, amounting to only 0.00625 square miles, and cities and towns that are fully developed might still choose to redevelop a parcel. And even assuming that the four-acre requirement might favor some cities or towns over others, the local matters exclusion "does not require that a proposed statute have uniform, Statewide application" (emphasis added). Massachusetts Teachers Ass'n, 384 Mass. at 224.

It may well be true that this petition was motivated by one person's desire to profit from the Commonwealth's developing gaming industry, based on his ownership interest in a particular property; the interests that propel both proponents and opponents of initiative petitions may often involve self-interest rather than the public interest. But our focus in deciding whether an initiative petition reaches the voters must be on the actual law proposed by the petition, not on the motives that may lie behind it; the voters may consider those

motives in deciding how they vote on the petition.  Because the language of the proposed law would permit the additional slots parlor to be located at many potential sites in the Commonwealth, it is not reasonably clear that the petition contains terms that "by fair implication are geographically descriptive of territorial divisions of the Commonwealth." Mount Washington, 288 Mass. at 74.  The petition, if approved by the voters of Massachusetts, would not require that the additional slots parlor license be awarded only to an applicant located near Suffolk Downs.

c.  Factual examination by Attorney General.  The plaintiffs also contend that the Attorney General failed to conduct an adequate factual inquiry concerning the petition's alleged inclusion of excluded local matters.  We have previously held, however, that "the Attorney General is not to become involved with holding extensive hearings to determine the full factual impact of a petition."  Yankee Atomic Elec. Co. v. Secretary of the Commonwealth, 402 Mass. 750, 758 (1988) (Yankee I).  Rather, "the factual examination required of the Attorney General is limited to matters implicit in the language of the petition and to matters of which the Attorney General may properly take official notice."  Yankee II, 403 Mass. at 205.  "Official notice includes matters subject to judicial notice, as well as additional items of which an agency official may take

notice due to the agency's established familiarity with and expertise regarding a particular subject area." Id., quoting Yankee I, supra at 759 n.7. Such facts, we have said, can be "quickly determined," so that the Attorney General's "determinations w[ill] not involve undue delay which might frustrate the initiative process." Yankee I, supra at 759.

In this case, the Attorney General has stipulated that she did not take official notice of how many race tracks currently existing in the Commonwealth would meet the requirements set forth in the proposed law. But she was not obligated to do so where the facts alleged by the plaintiffs are not appropriate for judicial notice. See Mass. G. Evid. § 201(b). Nor have the plaintiffs demonstrated that there were any additional matters that the Attorney General should have officially noticed based on her office's established familiarity and expertise. In light of the deference due the Attorney General's reasonable determinations concerning facts subject to her official notice, see Associated Indus. of Mass., 418 Mass. at 286, we conclude that the Attorney General was not required to undertake further factual investigation.

2. Exclusion of "substantially the same" matters. Article 48 also requires the Attorney General to certify that "the measure is not, either affirmatively or negatively, substantially the same as any measure which has been qualified

for submission or submitted to the people at either of the two preceding biennial state elections."  See art. 48, The Initiative, II, § 3, as amended by art. 74.  This provision appears to have been intended especially to prevent "the constant forcing of . . . questions which have been rejected." Constitutional Debates, supra at 673.  But it also prohibits hasty efforts to repeal laws previously enacted by initiative. See Opinion of the Justices, 422 Mass. 1212, 1225 (1996) (art. 48 "prohibit[s] initiative proposals relating to measures the substance of which were enacted in either of the two prior State-wide elections").

The plaintiffs contend that the Attorney General improperly certified the petition because it is "substantially the same" as question 3 on the 2014 ballot, which sought to prohibit casinos, slots parlors, and wagering on simulcast greyhound races.  To address this issue, we must construe the meaning of the phrase "substantially the same," which we have not previously interpreted in this context.[14]

We have previously interpreted "substantially," in other contexts, as meaning "really or essentially."  See Bennett v.

---

[14] In Opinion of the Justices, 422 Mass. 1212, 1224 (1996), the justices considered an initiative petition that would have revised a term limits law that had just been enacted through the initiative process.  They concluded that the new petition was substantially the same as the previously enacted initiative petition but did not specifically analyze or construe the phrase "substantially the same."  See id. at 1224-1225.

Newell, 266 Mass. 127, 131 (1929), citing Commonwealth v. Wentworth, 118 Mass. 441, 442 (1875).  See also Hollinger Inc. v. Hollinger Int'l, Inc., 858 A.2d 342, 377 (Del. Ch. 2004) ("Substantially conveys the same meaning as 'considerably' and 'essentially' because it means 'to a great extent or degree' and communicates that it is very nearly the same thing . . ." [footnote omitted]).  We have also said that where two matters are "substantially the same," there is "no substantive difference between" them.  Haran v. Board of Registration in Med., 398 Mass. 571, 574-575 (1986).

We also note that an earlier version of the "substantially the same" provision of art. 48, as presented at the constitutional convention, required the Attorney General to certify that "the measure petitioned for is not, either in form or in essential substance, either affirmatively or negatively, the same as any measure which has been submitted to the people" (emphasis added).  Constitutional Debates, supra at 675-676. The committee on form and phraseology subsequently revised this provision and adopted the language that currently appears in art. 48, requiring the Attorney General to certify that the measure "is not, either affirmatively or negatively, substantially the same as any measure which has been qualified for submission or submitted to the people."  Id. at 953.  In so doing, the committee commented that "[n]o change has been made

in the document that affects its meaning one way or the other." Id. at 959.

Accordingly, we interpret the phrase "substantially the same" in art. 48 to mean "essentially the same," or "with little or no substantive difference." Thus, a measure would be "affirmatively or negatively, substantially the same" as a previous measure where it affirms or negates essentially the same provisions, with little or no substantive difference.

With that standard in mind, we now compare question 3 and petition 15-34. The law proposed in question 3, which was rejected by the voters in the November, 2014, election, contained two elements. First, it would have revised the definition of "illegal gaming" under G. L. c. 4, § 7, Tenth, to prohibit casinos, slots parlors, and parimutuel wagering on simulcast greyhound races. Second, it would have added a new § 72 to G. L. c. 23K, prohibiting any "illegal gaming" as redefined in G. L. c. 4, § 7, Tenth, and barring the commission from accepting or approving any application to conduct "illegal gaming." Thus, it would have effectively nullified all of the other provisions of G. L. c. 23K. See Abdow, 468 Mass. at 483-484 (describing initiative petition that resulted in question 3). By contrast, petition 15-34 merely seeks to make one incremental change in the licensing scheme for slots parlors by authorizing the commission to award a second license.

We conclude that these two measures are not substantially the same, either affirmatively or negatively. Question 3 asked whether the voters wanted to prohibit casinos, slots parlors, and wagering on simulcast greyhound races. Petition 15-34 asks whether the voters want to permit the licensing of a second slots parlor adjacent to a horse racing track.

Nor is there any actual overlap in the specific legal provisions of the two proposed measures. Question 3 would have amended G. L. c. 4, § 7, Tenth, and added a new § 72 to G. L. c. 23K. Petition 15-34 would amend G. L. c. 23K, §§ 8 and 20. Therefore, petition 15-34 does "not propose (or seek to repeal or change) a law that has been voted on in either of the last two State-wide elections." Opinion of the Justices, 422 Mass. at 1224. The two measures overlap only insofar as, at the highest level of generality, they both concern slots parlors. We do not think that is enough to establish that question 3 and petition 15-34 are substantially the same, where they are otherwise so different in scope and subject matter. We therefore conclude that the Attorney General correctly certified that petition 15-34 is not, either affirmatively or negatively, substantially the same as any measure that has been qualified for submission or submitted to the people at either of the two preceding biennial State elections.

<u>Conclusion</u>.  Having determined that the Attorney General properly certified petition 15-34 pursuant to art. 48, The Initiative, II, § 3, as amended by art. 74, we remand the case to the county court for entry of a declaratory judgment to that effect.

<u>So ordered</u>.

<u>Appendix</u>.

An <u>Act</u> <u>Relative</u> To <u>Expanded</u> <u>Gaming</u>

Be it enacted by the People, and by their authority:

SECTION 1.  Subsection (a) of Section 8 of Chapter 23K of the General Laws, as appearing in the 2012 Official Edition is hereby amended by striking out the first sentence and inserting in place thereof the following sentence:-  The commission shall issue a request for applications for category 1 and category 2 licenses.

SECTION 2.  Section 20 of said Chapter 23K of the General Laws, as so appearing, is hereby amended by adding the following subsection:-

(g)  Notwithstanding any general or special law, rule, or regulation to the contrary, the commission may issue 1 additional category 2 license; provided, however, that the additional category 2 license shall only be issued to applicants who are qualified under the criteria set forth in this chapter as determined by the commission and that the additional category 2 license meet the following additional qualification:

(1)  The proposed location of the gaming establishment shall be at least 4 acres large, and shall be adjacent to, and within 1500 feet of, a race track, including the track, grounds, paddocks, barns, auditorium, amphitheatre and/or bleachers, if any, where a horse racing meeting may physically be held, which race track shall have hosted a horse racing meeting, provided that said location is not separated from said race track by a highway or railway.