NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13361

ROBERT HERRMANN & others[1]  vs.  ATTORNEY GENERAL & another[2]
(and a consolidated case[3]).

Suffolk.     February 6, 2023. - May 16, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt, & Georges, JJ.

Initiative.  Constitutional Law, Initiative petition, Political contributions.  Elections, Political contributions.  Political Committee.  Moot Question.  Attorney General.

Civil actions commenced in the Supreme Judicial Court for the county of Suffolk on October 24, 2022.

After consolidation, the cases were reported by Wendlandt, J.

Lawrence Lessig (Thomas O. Bean also present) for David C. Baxter & others.
Ronald A. Fein (Courtney M. Hostetler & John C. Bonifaz also present) for Robert Herrmann & others.
Anne Sterman, Assistant Attorney General (Adam Hornstine, Assistant Attorney General, also present) for the Attorney General & another.

---

[1] Lars Mikkelsen, Joshua Redstone, and Graeme Sephton.

[2] Secretary of the Commonwealth.

[3] David C. Baxter & others  vs.  Attorney General & another.

Thaddeus A. Heuer, for Fiscal Alliance Foundation, amicus curiae, submitted a brief.

KAFKER, J. The plaintiffs seek review of the Attorney General's decision not to certify their initiative petition.[4] The plaintiffs' proposed law would have instituted limits on contributions to independent expenditure political action committees, more commonly known as "Super PACs." The Attorney General determined that the proposed law conflicted with the right of free speech protected by the Massachusetts Declaration of Rights and that it therefore addressed an excluded subject under art. 48 of the Amendments to the Massachusetts Constitution, which sets out the procedures for the popular initiative. See art. 48, The Initiative, II, § 2. In so ruling, the Attorney General determined that United States Supreme Court precedent precludes this type of limitation on campaign contributions under the First Amendment to the United States Constitution and that the State constitutional right of free speech must extend at least as far as the cognate right under the Federal Constitution. See 1A Auto, Inc. v. Director

---

[4] The single justice consolidated two complaints from two separate groups of plaintiffs. Each plaintiff was one of the ten initial sponsors of the initiative petition. As explained infra, the two plaintiff groups seek identical relief but under different theories for why the proposed law is constitutional.

of the Office of Campaign & Political Fin., 480 Mass. 423, 440 (2018), cert. denied, 139 S. Ct. 2613 (2019).

After the plaintiffs brought these appeals challenging the denial, the Attorney General offered to agree to a stipulated order with the initiative proponents that would have allowed them to gather the initial round of voter signatures required by art. 48 during their appeals, despite the Attorney General's conclusion that the initiative addressed an excluded subject. See Abdow v. Attorney Gen., 468 Mass. 478, 485 (2014). The proponents, however, refused to agree to such an order. The Attorney General now contends that the appeals are moot, as the proponents did not gather the first round of signatures by the deadline required by art. 48.

We conclude that the cases are moot. When the petition was filed in June 2022, the proponents initiated a streamlined governmental process involving numerous State actors, including the Attorney General, the Secretary of the Commonwealth, and the General Court. The petitioners' filing with the Attorney General was timely, as it was submitted "not later" than August 2022, as required by art. 48, The Initiative, II, § 3, as amended by art. 74 of the Amendments. By filing at that particular time, they established the particular assembling of the General Court, and thus the legislative session, into which they would have needed to introduce the petition: the 2023

session.  It was not then within the control of the petitioners to stop and restart the process, as they contend.  They were required to meet the subsequent deadlines.  They did not, however, meet the December 2022 deadline to file additional signatures with the Secretary of the Commonwealth.  Thus, the cases are now moot.

Because the cases are moot and raise constitutional questions, including Federal constitutional questions, we decline to consider the merits.  Lockhart v. Attorney Gen., 390 Mass. 780, 782 (1984).  As a general matter, we avoid resolving moot questions, unless they are important, likely to recur, and otherwise avoid review.  See Lynn v. Murrell, 489 Mass. 579, 583 (2022); Lockhart, supra at 783-784.  Whether this issue is likely to recur is a matter of speculation.  At this point, only the ten initial proponents have indicated their support for the initiative.  They gathered no additional signatures.  Thus, it is far from clear whether the proponents would, in a future year, collect sufficient signatures to make the question a live issue.  The question, albeit important, is also one of constitutional law.  We are particularly reluctant to decide constitutional questions in moot cases.  See Murrell, supra at 584, quoting Lockhart, supra at 784.  Finally, the issue presented raises Federal as well as State constitutional issues, requiring us to review and decide Federal constitutional

questions best left to the Federal judiciary.  For all these reasons, we decline to address the merits in these moot cases.[5]

Background.  According to campaign finance law, political action committees (PACs) that make expenditures that are uncoordinated with political candidates are known as "independent expenditure PACs" or "Super PACs."  See G. L. c. 55, § 18A (d).  In June 2022, proponents of a law that would limit individual contributions to independent expenditure PACs submitted an initiative petition to the Attorney General.  The Attorney General declined to certify the petition in September 2022, as she determined that it was inconsistent with the right of free speech protected by the Massachusetts Declaration of Rights and thus addressed an excluded subject under art. 48. She relied on Federal cases concluding that the First Amendment precluded such limitations.  In October 2022, the ten proponents, split between two groups of plaintiffs, filed complaints in the county court challenging the Attorney General's decision not to certify the petition.  The two groups seek identical relief but have different theories for why the proposed law is constitutional.

The Attorney General indicated to the plaintiffs that they would need to submit additional signatures by December 2022, or

_____

[5] We acknowledge the amicus brief submitted by the Fiscal Alliance Foundation.

their appeals would become moot. To that end, she offered to move for an order allowing the proponents to collect signatures in advance of a judicial ruling on her denial, but the proponents declined.[6] Thus, they have not yet demonstrated support from voters beyond the ten initial signers of the petition. They contend that, because they intend to have their petition considered by the Legislature in January 2024, not January 2023, they have until December 2023 to collect additional signatures.

The plaintiffs seek judgments under G. L. c. 231A, § 1, declaring that they are not required to submit additional signatures until December 2023 and that the Attorney General erred in declining to certify the petition because the proposed initiative does not violate the First Amendment or art. 16 of the Massachusetts Declaration of Rights. In November 2022, the defendants moved to dismiss, arguing that because the plaintiffs admitted that they would not gather the required signatures before December, their claims were (or would soon become) moot. A single justice granted the parties' joint motion to consolidate the cases and reserved and reported the cases to the

---

[6] Such orders are consistent with the long-standing practice of the Attorney General and this court. See, e.g., Abdow, 468 Mass. at 485; Paisner v. Attorney Gen., 390 Mass. 593, 595-596 (1983).

full court.  In the meantime, the proponents did not submit the required signatures by December 2022.

Discussion.  1.  Article 48 time frame.  The first issue to be decided is the time frame for compliance with the initiative petition process.  Article 48 contains a series of interrelated and tightly defined time periods for different governmental actors to perform their respective functions regarding the proposed law, while simultaneously imposing on proponents requirements to gather an increasing number of signatures if they want these governmental actors -- and ultimately the voters -- to consider the initiative.  See Bogertman v. Attorney Gen., 474 Mass. 607, 610-611 (2016) (describing process).

At issue are three specific deadlines.  First, ten qualified voters may submit an initiative petition "to the [Attorney General] not later than the first Wednesday of the August before the assembling of the [G]eneral [C]ourt into which it is to be introduced."  Art. 48, The Initiative, II, § 3, as amended by art. 74.  This deadline provides the Attorney General time to determine whether the initiative petition is valid, including whether it contains excluded matters, before the signature gathering process commences.  Second, "[a]ll initiative petitions . . . shall be filed with the [S]ecretary of the [C]ommonwealth not earlier than the first Wednesday of the September before the assembling of the [G]eneral [C]ourt

into which they are to be introduced." Id. After this filing, the proponents may begin gathering signatures from supporters. Then, third, "the remainder of the required signatures shall be filed not later than the first Wednesday of the following December." Id. By this point, the petition must have voter signatures totaling at least "three per cent of the entire vote cast for [G]overnor at the preceding biennial [S]tate election." Art. 48, The Initiative, V, § 1, as amended by art. 81 of the Amendments.

After these three initial steps, the initiative is transmitted to the Legislature in the following year. Art. 48, The Initiative, II, § 4. The Legislature then has until May to take action itself:

> "If the [G]eneral [C]ourt fails to enact such law before the first Wednesday of May, and if such petition is completed by filing with the [S]ecretary of the [C]ommonwealth, not earlier than the first Wednesday of the following June nor later than the first Wednesday of the following July, a number of signatures of qualified voters equal in number to not less than one half of one per cent of the entire vote cast for [G]overnor at the preceding biennial [S]tate election, in addition to those signing such initiative petition, which signatures must have been obtained after the first Wednesday of May aforesaid, then the [S]ecretary of the [C]ommonwealth shall submit such proposed law to the people at the next [S]tate election."

Art. 48, The Initiative, V, § 1, as amended by art. 81. The Legislature may also pass a "legislative substitute" to appear on the ballot at the same time as the initiative, but may do so

after the May deadline.  See Opinion of the Justices, 370 Mass. 869, 877 (1976).

The Attorney General interprets these provisions to create a continuous process of filing and signature gathering during a concentrated time period.  As the petition in these cases was filed with the Attorney General in June 2022, it must be filed no earlier than September 2022 with the Secretary of the Commonwealth.  Then, the signatures necessary for legislative action must be filed no later than December 2022, with follow-up signatures for placement on the ballot by July 2023, even though the election would not take place until November 2024.

By contrast, the proponents argue that the two-year election cycle provides them more choice and flexibility.  They contend that because they filed with the Attorney General by August 2022, either they can follow the process outlined above, or they can start the process and then choose to delay a year, either for strategic reasons or, as in these cases, to pursue an appeal from the Attorney General's denial of certification.  In this alternate timeline, if we dispose of these appeals in their favor, they would file with the Secretary of the Commonwealth by September 2023, gather the necessary signatures for legislative action by December 2023, and finally (if the Legislature does not pass the law by May 2024) gather follow-up signatures by July 2024 for the November election.  The proponents contend

that this more relaxed calendar would allow buffer time for judicial review of the Attorney General's certification decision, so that they would not have to collect signatures under a cloud of legal uncertainty.[7]

"In interpreting any statutory or constitutional provision, including [art. 48], the starting point of our analysis is its plain language . . . ." Schulman v. Attorney Gen., 447 Mass. 189, 191 (2006). With regard to the mandatory deadlines in art. 48, we have also said: "It is not possible to treat these words of the amendment as precatory or merely directory. They are an explicit command from the people." Opinion of the Justices, 237 Mass. 589, 590-591 (1921). The key dispute between the parties is how to interpret the event to which the three interconnected deadlines are keyed: the "assembling of the [G]eneral [C]ourt into which [the petition] is to be introduced," that is, the annual session in which the Legislature will consider the initiative.[8] Art. 48, The Initiative, II, § 3, as amended by art. 74. Under the Attorney General's interpretation, this

_____

[7] This rationale -- that "a contest over the validity of a proposed initiative has an adverse effect on efforts to obtain the necessary signatures" -- was not found persuasive in Lockhart, 390 Mass. at 782.

[8] See art. 64, § 2, of the Amendments, as amended by art. 82 of the Amendments ("The general court shall assemble every year on the first Wednesday in January"). Thus, the "assembling of the [G]eneral [C]ourt" refers to an annual legislative session.

session must be the one immediately following the date that she receives the filing.  The proponents contend instead that they can choose the assembling in which they intend the Legislature to consider their petition after they file with the Attorney General, as long as they meet the August deadline in an even-numbered year (thus allowing two possible opportunities for legislative consideration before the next election).

We conclude that the Attorney General's interpretation is correct.  A close reading of the text establishes that art. 48 creates a continuous, time-delimited process that occurs from the initial filing of the petition no later than the first Wednesday in August to the filing of the final round of signatures by no later than the first Wednesday in the following July.  See Opinion of the Justices, 370 Mass. at 875 ("the deadline . . . was fixed to permit sufficient time for the taking of the additional steps to have the initiative measure appear on the ballot at the next State election").  Fixed time points in August, September, and December of the same year, and not different years, are identified, as well as the following May and July.  The timing provisions are tightly interconnected, identifying a series of actions involving different governmental actors that must occur within a relatively short period of time.  Within that concentrated period of time, the petition is evaluated for legality,

sufficient signatures are required to demonstrate significant support for the initiative to merit further consideration, and the Legislature is provided with the ability to weigh in with a substitute proposal.  The process thereby provides for a timely and efficient governmental review for proposals that demonstrate sufficient public support.  Stale or outdated interpretations of law by the Attorney General and unnecessary decisions by this court are thereby avoided.  A governmental process that petitioners can stop and start without demonstrating sufficient public support is inconsistent with this structure.  Cf. Unger v. Rosenblum, 362 Or. 210, 225 (2017) ("the tightly crafted, interconnected series of deadlines" in State initiative process suggests that proponents may not delay for "an indefinite amount of time").

Previously, we relied on the interconnected nature of the art. 48 timeline to determine the deadline for the Governor's approval or veto of an initiative passed by the Legislature. Opinion of the Justices, 370 Mass. at 874.  We summarized the timing requirements, and then explained that

> "in order to give effect to these provisions, which set forth a timetable for taking the steps necessary to have a proposed law placed on the ballot, we conclude that all constitutional steps for passage of a law, including the Governor's approbation or legislative action after veto of the measure, must occur before the first Wednesday of May."

Id. at 875. Article 48 thus creates a strict calendar that must be adhered to for a proposed law to make it to the ballot.

Once the initial petition is filed, the clock begins to tick. By filing in August of a particular year, initiative proponents are identifying the particular "assembling of the [G]eneral [C]ourt into which [the petition] is to be introduced" as the next one that will occur following the filing. If the Attorney General denies their petition, they cannot then delay by claiming that they now intend to submit a petition into the "assembling" that will occur a year later.

We recognize that when art. 48 was originally passed and the deadlines set out above were established, the Commonwealth had annual elections, making the deadlines straightforward and simpler to interpret. See Opinion of the Justices, 291 Mass. 578, 585 (1935) (art. 48 "was framed, approved and voted to be submitted to the people by the Constitutional Convention in 1917 at a time when there were annual elections for the choice of members of the General Court. Its words doubtless were adapted to that situation"). Today, this process occurs in the context of biennial elections. Although the interpretation of art. 48 is less obvious in this context, the article, read as a whole, creates a continuous, concentrated governmental process that commences with the initial filing. Regardless of which year the petition is filed, the governmental process continues unabated.

What results is that proponents who file in an even-numbered year have a full year to campaign after they submit their final set of signatures, while proponents who file in an odd-numbered year (most of them, according to the Attorney General) go straight to the election. The petitioners thereby control how long they have to campaign but not other aspects of the governmental process.

2. _Constitutional questions_. Because the proponents did not submit any signatures to the Secretary of the Commonwealth by December 2022, these cases are moot. See _Lockhart_, 390 Mass. 782. Although this court may decide important moot questions that are likely to recur and otherwise avoid review, we are particularly reluctant to resolve moot questions of constitutional law, especially ones raising Federal as well as State constitutional law. As these moot cases raise such constitutional questions, we decline to address the merits.

Despite mootness, "where the proceedings raise an issue that is of public importance, worthy of decision by an appellate court, and is capable of repetition yet evading review, a court may in its discretion choose to decide the case." _Harmon_ v. _Commissioner of Correction_, 487 Mass. 470, 471-472 (2021). See _Murrell_, 489 Mass. at 583. Here, however, it is far from clear that this issue is likely to recur. The proponents have not demonstrated that they have the requisite support to satisfy the

different signature gathering obligations set out in art. 48 necessary to make this an issue requiring judicial resolution. So far, they have only indicated that they themselves support the petition. Thus, "it is not clear that the issues will arise again in the same form or in any form." Lockhart, 390 Mass. at 784.

We have also emphasized that we are particularly reluctant to decide moot constitutional questions. As this court explained in Lockhart, another case involving the Attorney General's declining to certify a petition and the failure of the petitioners to gather the necessary number of signatures, we have a "long tradition of not unnecessarily deciding constitutional questions." Lockhart, 390 Mass. at 784. See also Massachusetts Gen. Hosp. v. C.R., 484 Mass. 472, 488 (2020) ("We do not . . . decide constitutional questions unnecessarily or prematurely"). When the case is moot, we exercise "'judicial restraint,' especially regarding purported constitutional claims." Lockhart, supra, quoting Blake v. Massachusetts Parole Bd., 369 Mass. 701, 707 (1976).

It is even more important for us to exercise such restraint when the moot question that we are asked to decide is one based on Federal constitutional law, as it is here. See Breese v. Smith, 501 P.2d 159, 166 (Alaska 1972) ("avoidance of the federal thicket is the better course"); Portland v. Jacobsky,

496 A.2d 646, 648 (Me. 1985) ("policy of judicial restraint impels us to forbear from ruling on federal constitutional questions").  While the question whether a proposed law bears on an excluded subject under art. 48 is by its terms a question of State constitutional law, see Associated Indus. of Mass. v. Attorney Gen., 418 Mass. 279, 284 (1994), in the instant cases, the question to be decided ultimately revolves around Federal constitutional law.  This is because we cannot provide less protection under the Massachusetts Declaration of Rights for political contributions than that provided for such contributions under the First Amendment, and at least in regard to political contributions by corporations, we have stated:  "We see no reason to conclude that art. 16 or 19 gives corporations greater rights of political participation than they enjoy under the First Amendment."  1A Auto, Inc., 480 Mass. at 440. Recognizing the significant protections found so far by the Federal courts for political contributions, the Attorney General therefore turned to Federal constitutional law and the Federal courts for guidance on what was precluded by the Federal Constitution and thus art. 48 as well.  If we were to decide this now moot question, we would have to do the same, deciding unnecessarily a question best left to the Federal judiciary.

Exercising judicial restraint for the reasons explained supra, we decline to do so.[9]

Conclusion.  Article 48 requires proponents to collect signatures in the months immediately following the proponents' filing of an initiative petition with the Attorney General. Because the plaintiffs in the instant cases did not follow this timeline, these cases are moot.  We also decline to exercise our discretion to resolve a moot issue, as this matter has not been demonstrated to be one of those rare issues that are likely to recur and yet avoid review.  Harmon, 487 Mass. at 471-472. Finally and importantly, this court exercises judicial restraint and does not unnecessarily resolve State and Federal constitutional questions in a moot case.  For all of the reasons stated supra, these cases are dismissed.

So ordered.

---

[9] We also note that if, in the future, we are required to revisit whether limitations on contributions to independent expenditure PACs conflict with the Federal right to free speech, the United States Supreme Court itself may, by that time, have ruled on the exact issue presented.