GANTS, C.J.
**424 For more than a century, Massachusetts law, like Federal law, see 52 U.S.C. § 30118(a) (2012 & Supp. II), has prohibited business corporations from making contributions to political candidates or their campaigns. See St. 1907, c. 581. The plaintiffs here are business corporations who challenge Massachusetts's ban on corporate contributions, G. L. c. 55, § 8, claiming that it imposes an unconstitutional restraint on their rights to free speech and association. The corporations also claim that, because § 8 prohibits corporations from making contributions but does not also prohibit other entities -- such as unions and nonprofit organizations -- from doing so, it denies them their right to equal protection under the law. We affirm the Superior Court judge's grant of summary judgment in favor of the defendant, the director of the Office of Campaign and Political Finance (OCPF), on both claims.[2]
Background. 1. Limits on corporate political spending. Laws limiting the political spending of corporations have a long historical *1179 pedigree. The earliest such laws emerged more than a century ago, as growing public concern over the influence of corporations in politics led to widespread calls for regulation. Federal Election Comm'n v. Beaumont, 539 U.S. 146, 152, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003) ( Beaumont ). See R.E. Mutch, Buying the Vote: A History of Campaign Finance Reform 16-17, 33, 43-44 (2014). In 1905, President Theodore Roosevelt urged Congress to take action, recommending a total ban on corporate political contributions in order to prevent "bribery and corruption in Federal elections." 40 Cong. Rec. S96 (Dec. 5, 1905). Congress responded in 1907 by **425 enacting the Tillman Act, 34 Stat. 864 (1907), which prohibited "any corporation" from "mak[ing] a money contribution in connection with any election to any political office."
The same year that Congress enacted the Tillman Act, the Massachusetts Legislature enacted its own law prohibiting corporations from making campaign contributions. See St. 1907, c. 581, § 3.[3] Over the next few decades, the Legislature further refined this ban on corporate contributions, while integrating it into its broader efforts to combat corruption in State elections. See, e.g., St. 1913, c. 835, §§ 353, 356 ("Corrupt Practices" section of "An Act to codify the laws relative to primaries, caucuses and elections"); St. 1946, c. 537, § 10 ("An Act relative to corrupt practices, election inquests and violations of election laws"). In 2009, the Legislature extended the ban to apply not only to traditional business corporations but also to any "professional corporation, partnership, [or] limited liability company partnership." St. 2009, c. 28, § 33.
Massachusetts's current ban on corporate contributions, G. L. c. 55, § 8, prohibits business corporations and other profit-making entities from making contributions with respect to State or local candidates. It states, in relevant part:
"[N]o business or professional corporation, partnership, [or] limited liability company partnership under the laws of or doing business in the commonwealth ... shall directly or indirectly give, pay, expend or contribute[ ] any money or other valuable thing for the purpose of aiding, promoting or preventing the nomination or election of any person to public office, or aiding or promoting or antagonizing the interest of any political party."
To understand what a business corporation may and may not do to support a political candidate under current Massachusetts law, we need to describe the different possible ways in which money can be used to support a political candidate's campaign. One way is to make contributions, in cash or things of value, directly to the candidate or to a committee organized on the candidate's behalf. See G. L. c. 55, § 1. A second way is to establish and pay the administrative expenses of a political action committee (PAC), **426 which may then raise money from various sources, and use that money to support a candidate's campaign. See G. L. c. 55, §§ 1, 5. A third way is to make contributions to a PAC. See G. L. c. 55, § 1. A fourth way is to make "independent expenditures," which are expenditures made to advocate for or against a candidate -- for example by purchasing newspaper, radio, or television advertising praising the candidate or criticizing his or her opponent -- that are not made in cooperation *1180 with or in consultation with any candidate. See ibr.US_Case_Law.Schema.Case_Body:v1">id. A fifth way is to make contributions to independent expenditure PACs, sometimes called "super PACs," which, unlike ordinary PACs, may only make independent expenditures and may not contribute to candidates. See G. L. c. 55, § 18A (d ). See also OCPF, Interpretive Bulletin, OCPF-IB-10-03 (Oct. 2010) (rev. Jan. 2015); OCPF, Campaign Finance Activity by Political Action Committees in Massachusetts, 2011 & 2012, at 12 (July 2013).
Under Massachusetts law, corporations may not make any contributions to a candidate or to a candidate's committee, may not establish or administer a PAC, and may not contribute to a PAC that is not an independent expenditure PAC. See Op. Atty. Gen. No. 10 (Nov. 6, 1980), in Rep. A.G., Pub. Doc. No. 12 at 118-120 (1981). See also OCPF, Advisory Opinion, OCPF-AO-00-05 (Apr. 21, 2000); OCPF, Advisory Opinion, OCPF-AO-98-18 (July 31, 1998). Corporations may, however, make unlimited "independent expenditures," subject to certain disclosure requirements. See G. L. c. 55, §§ 18A, 18C, 18G. They may also make unlimited contributions to independent expenditure PACs. See 970 Code Mass. Regs. § 2.17 (2018). See also OCPF, Interpretive Bulletin, OCPF-IB-10-03, supra.
To illustrate, if a Massachusetts corporation wants to support a certain John Hancock for Massachusetts governor, it may not contribute money directly to Hancock or to Hancock's campaign committee. Nor may it establish and administer a PAC to solicit contributions for Hancock, or contribute to a PAC that in turn makes campaign contributions to Hancock. The corporation may, however, spend as much money as it likes advocating on behalf of Hancock, as long as it does so independently from him and his campaign. For example, it may, on its own initiative and without coordinating with Hancock, pay for a television advertisement urging viewers to vote for Hancock. It may also contribute to an independent expenditure PAC, which, provided it does not coordinate with Hancock, may spend money promoting him to the public.
**427 2. The present action. The plaintiffs in this case are two separate family-owned corporations doing business in Massachusetts. 1A Auto, Inc., is an automobile parts retailer in Pepperell. 126 Self Storage, Inc., operates a self-storage facility in Ashland. Under § 8, the plaintiffs are barred from making political contributions that they would otherwise choose to make.
The plaintiffs filed suit against the director of OCPF in his official capacity, seeking declaratory and injunctive relief against the continued enforcement of § 8. The plaintiffs alleged that, in banning corporate contributions, § 8 violates their free speech and association rights guaranteed under the First Amendment to the United States Constitution and arts. 16 and 19 of the Massachusetts Declaration of Rights. The plaintiffs also alleged that § 8 violates their right to equal protection of the law under the Fourteenth Amendment to the United States Constitution and art. 1 of the Massachusetts Declaration of Rights, because it prohibits corporations from making political contributions without also prohibiting other entities, like unions and nonprofit organizations, from doing so.
The plaintiffs moved for a preliminary injunction against the enforcement of § 8. A Superior Court judge denied the motion, finding that the plaintiffs were unable to show a likelihood of success on the merits. Following discovery, the parties filed cross motions for summary judgment. Another Superior Court judge denied the plaintiffs' motion and granted OCPF's motion. As to the plaintiffs' free speech and association *1181 claim, the judge noted that in Beaumont, 539 U.S. at 154-155, 162-163, 123 S.Ct. 2200, the United States Supreme Court rejected a constitutional challenge to the Federal ban on corporate contributions, holding that it was justified by the government's important interest in preventing corruption and the appearance of corruption. The judge concluded that, under that controlling precedent, § 8 was not unconstitutional under the First Amendment because its ban on corporate contributions is "closely drawn to serve the State's interest in preventing corruption or the appearance of corruption." He also concluded that arts. 16 and 19 of the Massachusetts Declaration of Rights grant a corporation no greater rights to make political contributions than the First Amendment. As to the plaintiffs' equal protection claim, the judge concluded that, because the plaintiffs had failed to demonstrate that corporations and unions are similarly situated, § 8 did not violate the equal protection clause of the Fourteenth Amendment or its parallel in art. 1. The **428 plaintiffs appealed from the judge's grant of summary judgment, and we allowed their application for direct appellate review.
Discussion. We review a decision to grant summary judgment de novo. See Twomey v. Middleborough, 468 Mass. 260, 267, 10 N.E.3d 618 (2014). "[W]here both parties have moved for summary judgment, the evidence is viewed in the light most favorable to the party against whom judgment is to enter" (citation omitted), in this case, the plaintiffs. Id.
1. Free speech and association claim. The corporations claim that § 8 violates their rights of free speech and association under both the First Amendment and arts. 16 and 19. In interpreting the United States Constitution, we are of course bound by the decisions of the United States Supreme Court, and we "can neither add to nor subtract from the mandates of the United States Constitution." Commonwealth v. Cote, 386 Mass. 354, 360-361, 435 N.E.2d 1047 (1982), quoting North Carolina v. Butler, 441 U.S. 369, 376, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). We are, however, "free to interpret [S]tate constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution." Goodridge v. Department of Pub. Health, 440 Mass. 309, 328, 798 N.E.2d 941 (2003), quoting Arizona v. Evans, 514 U.S. 1, 8, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). We must therefore first consider whether § 8 is constitutional under the First Amendment, as interpreted by the Supreme Court. If it is, we must then consider whether our Declaration of Rights is more protective of corporate contributions than the First Amendment and, if so, whether § 8 complies with that more protective constitutional standard.
a. First Amendment. "Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established in our Constitution." Buckley v. Valeo, 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). For this reason, "[t]he First Amendment affords the broadest protection to such political expression." Id. And because, in today's world, the communication of political views and opinions -- whether by distributing pamphlets, or through mass media -- almost inevitably costs money, see id. at 19, 96 S.Ct. 612, laws that limit political spending must be recognized as "operat[ing] in an area of the most fundamental First Amendment activities," id. at 14, 96 S.Ct. 612. At the same time, such limits are also an integral feature of campaign finance laws in this State and across the nation, designed to diminish the risk of government *1182 corruption, as well as the appearance of such corruption. **429 Political contributions from corporations are prohibited not only under Massachusetts law, G. L. c. 55, § 8, but also under Federal law, 52 U.S.C. § 30118(a), as well as under the laws of twenty-one other States.[4] See National Conference of State Legislatures, State Limits on Contributions to Candidates, 2017-2018 Election Cycle (June 27,2017). In Beaumont, 539 U.S. at 149, 123 S.Ct. 2200, the Supreme Court rejected a constitutional challenge to the Federal ban, which prohibits corporations from making contributions to candidates running for Federal office. In doing so, the Court relied on the long-standing distinction -- first articulated in Buckley, 424 U.S. at 19-21, 96 S.Ct. 612 -- between laws that limit independent expenditures and laws that limit contributions. As the Court stated, independent expenditure limits are subject to strict scrutiny, whereas contribution limits are reviewed under a less rigorous standard, and will be upheld as long as they are " 'closely drawn' to match a 'sufficiently important interest.' " Beaumont, 539 U.S. at 162, 123 S.Ct. 2200, quoting Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 387-388, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). This is because, as the Court first explained in Buckley, contribution limits encroach to a lesser extent on First Amendment interests than independent expenditure limits: whereas independent expenditures are themselves a form of political expression, lying "at the core ... of the First Amendment freedoms," Buckley, 424 U.S. at 39, 96 S.Ct. 612, quoting Williams v. Rhodes, 393 U.S. 23, 32, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), a contribution is merely "a general expression of support for the candidate and his views, [which] does not communicate the underlying basis for the support." Buckley, 424 U.S. at 21, 96 S.Ct. 612. "[C]ontributions may result in political expression if spent by a candidate ... to present views to the voters, [but] the transformation of contributions into political debate involves speech by someone other than the contributor." Id. Thus, although limits on independent expenditures "necessarily reduce[ ] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached," id. at 19, 96 S.Ct. 612, limits on contributions **430 "entail[ ] only a marginal restriction upon the contributor's ability to engage in free communication." Id. at 20-21, 96 S.Ct. 612.
This core distinction between independent expenditures and contributions has become a "basic premise" of the Court's jurisprudence concerning campaign finance laws. Beaumont, 539 U.S. at 161, 123 S.Ct. 2200. Indeed, in the four decades since Buckley was decided, the Court has declared unconstitutional almost every independent expenditure limit that has come before it. See, e.g., *1183 Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 608, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (Federal limit on independent expenditures by political parties); Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 263, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (Federal ban on corporate independent expenditures as applied to nonprofit corporation); Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 501, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (Federal limit on independent expenditures by political committees); First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 795, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) (Massachusetts's ban on corporate independent expenditures in connection with initiative petition). In contrast, the Court has upheld most contribution limits. See, e.g., Nixon, 528 U.S. at 381-382, 120 S.Ct. 897 (Missouri's contribution limits); California Med. Ass'n v. Federal Election Comm'n, 453 U.S. 182, 184-185, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (Federal limit on contributions to multicandidate political committees). Cf. Federal Election Comm'n v. Colorado Republican Fed. Campaign Comm., 533 U.S. 431, 447, 465, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) ( Colorado Republican ) (upholding Federal coordinated expenditure limits by analogy to contribution limits).[5]
The Court in Beaumont, 539 U.S. at 161, 123 S.Ct. 2200, recognizing that contributions, unlike independent expenditures, "lie closer to the edges than to the core of political expression," held that the Federal ban on corporate contributions was subject only to "relatively complaisant review under the First Amendment." Applying this standard of review, the Court concluded that the Federal ban served four important government interests: First, the ban operated to "preven[t] corruption [and] the appearance of corruption." Id. at 154, 123 S.Ct. 2200, quoting **431 National Conservative Political Action Comm., 470 U.S. at 496-497, 105 S.Ct. 1459. Second, prohibiting corporations from making contributions to candidates also protected the interests of dissenting shareholders who did not support the same candidates. Beaumont, supra. Third, a ban on corporate contributions would prevent individuals from using corporations as vehicles to circumvent valid limits on individual contributions. Id. at 155, 123 S.Ct. 2200. And fourth, the ban served to "counter ... the misuse of corporate advantages," combatting not only quid pro quo corruption but also the risk that corporations, with their unique ability to accumulate wealth, would thereby wield "undue influence [over] an officeholder's judgment." Id. at 155-156, 123 S.Ct. 2200, quoting ColoradoRepublican, 533 U.S. at 440-441, 121 S.Ct. 2351. Having concluded that the ban served sufficiently important interests, the Court also concluded that the ban was "closely drawn" to meet those interests, noting that it was not "a complete ban" on corporate political expression, because Federal law still permitted corporations to participate in the electoral process by establishing, administering, and soliciting contributions through a PAC. Beaumont, supra at 162-163, 123 S.Ct. 2200.
Even though the Supreme Court declared in Beaumont, ibr.US_Case_Law.Schema.Case_Body:v1" id="p1184" href="#p1184" data-label="1184" data-citation-index="1" class="page-label">*1184id. at 163, 123 S.Ct. 2200, that an absolute ban on corporate contributions is constitutional under the First Amendment, the plaintiffs urge us nevertheless to rule that § 8 violates that amendment. "We are not free," however, "to construe the First Amendment as creating constitutional protection broader than that established by the Supreme Court." Matter of Roche, 381 Mass. 624, 631 n.8, 411 N.E.2d 466 (1980). It is a well-established principle that, where a Supreme Court precedent "has direct application in a case," lower courts must follow that precedent, even if it were "to rest on reasons rejected in some other line of decisions." Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Although the landscape of campaign finance law has changed significantly since Beaumont-- most notably because of the Supreme Court's decision in Citizens United v. Federal Election Comm'n, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) -- Beaumont remains "the law of the land until the Supreme Court decides otherwise," and we are bound to follow it. Commonwealth v. Runyan, 456 Mass. 230, 234, 922 N.E.2d 794 (2010), overruled on another ground, Commonwealth v. Reyes, 464 Mass. 245, 256, 982 N.E.2d 504 (2013).
In Citizens United, 558 U.S. at 365, 130 S.Ct. 876, the Court declared unconstitutional a Federal law that banned corporations from making independent expenditures, emphasizing that, under the First Amendment, the government may not restrict speech "on the **432 basis of the speaker's corporate identity." Applying strict scrutiny, ibr.US_Case_Law.Schema.Case_Body:v1">id. at 340, 130 S.Ct. 876, the Court concluded that the law was unconstitutional because it did not serve a sufficiently compelling interest. Id. at 365, 130 S.Ct. 876. In doing so, the Court overruled earlier decisions where it had taken a broader view of the government interests that could support restrictions on corporate political spending. Id. at 365-366, 130 S.Ct. 876. The Court declared that the only sufficiently compelling interest that could justify a restriction on political spending was the government's interest in preventing corruption or the appearance of corruption.[6] See ibr.US_Case_Law.Schema.Case_Body:v1">id. at 356-362, 130 S.Ct. 876. Moreover, the Court defined corruption *1185 narrowly, limiting it to "quid pro quo corruption" -- that is, the exchange of "dollars for political favors" -- and rejected the view that corruption could also take the form of disproportionate influence over or access to elected officials. Id. at 359, 130 S.Ct. 876, quoting National Conservative Political Action Comm., 470 U.S. at 497, 105 S.Ct. 1459.
The Court in Citizens United did not, however, overrule its decision in Beaumont. Indeed, the majority opinion did not even cite Beaumont. Moreover, Citizens United left much of the reasoning **433 in Beaumont undisturbed. In Citizens United, 558 U.S. at 345, 356-359, 130 S.Ct. 876, the Court reaffirmed the key distinction between contributions and independent expenditures, emphasizing that contributions present a special risk of quid pro quo corruption because, unlike independent expenditures, they are coordinated with candidates. See ibr.US_Case_Law.Schema.Case_Body:v1">id. at 357, 130 S.Ct. 876. For that reason, the Court recognized that contribution limits are "an accepted means to prevent quid pro quo corruption." Id. at 359, 130 S.Ct. 876. The Court also made clear that its analysis in Citizens United was specific to independent expenditure limits; it specifically did not "reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny." Id. See McCutcheon v. Federal Election Comm'n, 572 U.S. 185, 196-197, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) (plurality opinion) (reiterating different standards of review for contribution limits and independent expenditure limits).
To our knowledge, every Federal circuit court that has considered a constitutional challenge to laws banning corporate contributions since Citizens United has applied the controlling precedent in Beaumont and concluded that the laws were constitutional under the First Amendment. See, e.g., Iowa Right to Life Comm., Inc. v. Tooker, 717 F.3d 576, 601 (8th Cir. 2013), cert. denied, 572 U.S. 1046, 134 S.Ct. 1787, 188 L.Ed.2d 757 (2014) ; Minnesota Citizens Concerned for Life, Inc. v. Swanson, 692 F.3d 864, 877-880 (8th Cir. 2012) ; United States v. Danielczyk, 683 F.3d 611, 615-619 (4th Cir. 2012), cert. denied, 568 U.S. 1193, 133 S.Ct. 1459, 185 L.Ed.2d 362 (2013) ; Ognibene v. Parkes, 671 F.3d 174, 194-197 (2d Cir. 2011), cert. denied, 567 U.S. 935, 133" url="https://cite.case.law/citations/?q=133%20S.%20Ct.%2028">133 S.Ct. 28, 183 L.Ed.2d 676 (2012) ; Thalheimer v. San Diego, 645 F.3d 1109, 1124-1126 (9th Cir. 2011). Cf. Wagner v. Federal Election Comm'n, 793 F.3d 1, 5-32 (D.C. Cir. 2015), cert. denied sub nom. Miller v. Federal Election Comm'n, --- U.S. ----, 136 S.Ct. 895, 193 L.Ed.2d 789 (2016) (upholding ban on contributions by government contractors); Yamada v. Snipes, 786 F.3d 1182, 1204-1207 (9th Cir. 2015), cert. denied sub nom. Yamada v. Shoda, --- U.S. ----, 136 S.Ct. 569, 193 L.Ed.2d 428 (2015) (same); Green Party of Conn. v. Garfield, 616 F.3d 189, 198-205 (2d Cir. 2010) (same).
The plaintiffs contend that, even if we recognize Beaumont as controlling precedent (which we do), and apply its "closely drawn" standard of review (which we will), we should nonetheless conclude that § 8 violates their First Amendment rights. In support of this contention, the plaintiffs proffer two arguments.
First, they argue that § 8 does not advance a sufficiently important interest, *1186 because OCPF has failed to demonstrate that the ban on corporate political contributions is necessary to prevent **434 quid pro corruption or the appearance of quid pro quo corruption. They contend that, to demonstrate the constitutionality of such a ban, OCPF would need to present evidence of corporate contributions leading to quid pro quo corruption in Massachusetts. But imposing such an evidentiary burden on OCPF would be both unrealistic and unnecessary.
It would be unrealistic because corporate political contributions have been banned under Massachusetts law for over a century. Cf. Wagner, 793 F.3d at 14 ("Of course, we would not expect to find -- and we cannot demand -- continuing evidence of large-scale quid pro quo corruption or coercion involving federal contractor contributions [where] such contributions have been banned since 1940"). We cannot demand that OCPF provide evidence of what would happen in a "counterfactual world" where § 8 does not exist. McCutcheon, 572 U.S. at 219, 134 S.Ct. 1434 (plurality opinion). See Colorado Republican, 533 U.S. at 457, 121 S.Ct. 2351 (recognizing "difficulty of mustering evidence to support long-enforced statutes" because "there is no recent experience" without them). Cf. Burson v. Freeman, 504 U.S. 191, 208, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (plurality opinion) ("The fact that these laws have been in effect for a long period of time ... makes it difficult" to demonstrate "what would happen without them"). All we can ask is "whether experience under the present law confirms a serious threat of abuse." McCutcheon, supra, quoting Colorado Republican, supra.
And here, experience confirms that, if corporate contributions were allowed, there would be a serious threat of quid pro quo corruption. In Buckley, 424 U.S. at 27, 96 S.Ct. 612, the Supreme Court noted that, although actual instances of quid pro quo corruption can be difficult to detect, "the deeply disturbing" political scandals of the 1970s "demonstrate[d] that the problem is not an illusory one." Sadly, the risk of quid pro quo corruption is no less illusory in Massachusetts. In just the last decade, several Massachusetts politicians have been convicted of crimes stemming from bribery schemes intended to benefit corporations. See, e.g., United States v. McDonough, 727 F.3d 143, 147 (1st Cir. 2013), cert. denied, 571 U.S. 1177, 134 S.Ct. 1041, --- L.Ed.2d ---- (2014) ; United States v. Turner, 684 F.3d 244, 246 (1st Cir.), cert. denied, 568 U.S. 1018, 133 S.Ct. 629, 184 L.Ed.2d 409 (2012) ; United States v. Wilkerson, 675 F.3d 120, 121 (1st Cir. 2012). In addition, the record here shows that OCPF has prosecuted several cases involving corporations that sought to circumvent § 8 by making contributions through individual employees, who were later reimbursed with corporate funds. Such schemes indicate that, if not **435 for § 8, the inverse also would be possible, with individuals circumventing the limits on their own political contributions "by diverting money through ... corporation[s]." Beaumont, 539 U.S. at 155, 123 S.Ct. 2200. See ibr.US_Case_Law.Schema.Case_Body:v1">id. ("experience 'demonstrates how candidates, donors, and parties test the limits of the current law, and ... how contribution limits would be eroded if inducement to circumvent them were enhanced' " [citation omitted] ).[7]
It would also be unrealistic for a court to require the Legislature to wait for evidence *1187 of widespread quid pro quo corruption resulting from corporate contributions before taking steps to prevent such corruption. "There is no reason to require the [L]egislature to experience the very problem it fears before taking appropriate prophylactic measures." Ognibene, 671 F.3d at 188.
Apart from being unrealistic, requiring OCPF to provide recent examples of quid pro corruption resulting from corporate contributions is also unnecessary because we need not insist on evidence of actual corruption when the government also has an important interest in preventing the appearance of corruption. See ibr.US_Case_Law.Schema.Case_Body:v1">id. ("[T]o require evidence of actual scandals for contribution limits would conflate the interest in preventing actual corruption with the separate interest in preventing apparent corruption"). See also Buckley, 424 U.S. at 27, 96 S.Ct. 612 ("the impact of the appearance of corruption" is "[o]f almost equal concern as the danger of actual quid pro quo arrangements"). It requires "no great leap of reasoning" for us to infer that a ban on corporate contributions would counter at least the appearance of quid pro quo corruption. Green Party of Conn., 616 F.3d at 200. If corporate contributions were permitted, every time a political decision was made that helped or hurt a corporation's interests, members of the public might wonder if the corporation's political contributions -- or lack thereof -- played a role in the decision.
Both history and common sense have demonstrated that, when corporations make contributions to political candidates, there is a risk of corruption, both actual and perceived. See **436 Florida Bar v. Went For It, Inc., 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995), quoting Burson, 504 U.S. at 211, 112 S.Ct. 1846 (speech restrictions can be justified "based solely on history, consensus, and 'simple common sense' " [citation omitted] ). We conclude that § 8 advances the "sufficiently important interest" in preventing quid pro quo corruption and its appearance, and in preventing the circumvention of individual contribution limits through corporations.
The plaintiffs' second argument is that, even if § 8 does advance those important interests, it is not closely drawn for that purpose. The plaintiffs claim that § 8 is at once both overinclusive and underinclusive. It is overinclusive, they contend, because it is an outright ban on corporate contributions, when there are other, less restrictive options -- such as a contribution ceiling, or disclosure requirements -- that could also further those important interests. The Supreme Court rejected a similar argument in Beaumont, 539 U.S. at 162-163, 123 S.Ct. 2200, concluding that the equally comprehensive Federal ban on corporate contributions was nevertheless closely drawn.
The plaintiffs seek to distinguish this case from Beaumont, arguing that in Beaumont, ibr.US_Case_Law.Schema.Case_Body:v1">id. at 163, 123 S.Ct. 2200, the Court was able to reach this conclusion only because Federal law "allow[s] corporations 'to establish and pay the administrative expenses of [PACs]' " (citation omitted), whereas under Massachusetts law corporations are prohibited from doing so. The plaintiffs contend that, in *1188 Beaumont, the Court required as an "essential constitutional minimum" that corporations be allowed to establish and administer a PAC. But in Beaumont, supra at 162-163, 123 S.Ct. 2200, the Court noted the existence of a corporate-controlled "PAC option," not to suggest that it was a constitutionally mandated minimum, but rather to illustrate that corporations still had meaningful opportunities to participate in the political process.
Importantly, Beaumont was decided seven years before Citizens United, when Federal law still prohibited corporations from making independent expenditures. See Beaumont, supra. at 149, 123 S.Ct. 2200. In Beaumont, the Court singled out the PAC option because, at that time, it was one of the most important outlets for corporate speech. What the Court emphasized was that, because such outlets existed, the ban on corporate contributions was not "a complete ban" on all political expression by corporations. Id. at 162, 123 S.Ct. 2200.
Here, similarly, § 8 is not "a complete ban" on corporate political expression. Beaumont, supra. Although Massachusetts law **437 does not permit corporations to establish and administer a PAC, it has, since Citizens United, permitted corporations to engage in a significant form of political expression that was not allowed when Beaumont was decided -- that is, to make unlimited independent expenditures as well as unlimited contributions to independent expenditure PACs. See G. L. c. 55, §§ 18A, 18C, 18G. See also St. 2014, c. 210, §§ 4, 20-21, 25 (amending G. L. c. 55, §§ 1, 18A, 18C, 18G ). And predictably, OCPF records indicate that independent expenditures in connection with State elections have risen sharply since the ban was lifted. See OCPF Reports, Post Election 2016, at 2 (2016) (independent expenditures in 2016 State election approximately fifty per cent higher than in 2012 State election). Where corporations in Massachusetts are free to spend as much money as they would like independently advocating for their preferred candidates, or to contribute to an independent expenditure PAC, we cannot conclude that § 8 denies corporations the opportunity meaningfully to participate in the political process. See Thalheimer, 645 F.3d at 1125 ("[the] ability to directly contribute $500 to a candidate pales in significance to [the contributor's] ability to make unlimited independent expenditures ... supporting or opposing candidates").
Nor are we persuaded that § 8 must be invalidated because the government has the less restrictive option of regulating through disclosure requirements. In Buckley, 424 U.S. at 28, 96 S.Ct. 612, the Court defended Federal contribution limits against similar arguments, concluding that "Congress was surely entitled to conclude that disclosure was only a partial measure," and that contribution limits were "a necessary legislative concomitant to deal with the reality or appearance of corruption." Here, too, the Legislature was entitled to conclude that disclosure on its own would be insufficient to meet the government's anticorruption interest.
Having argued that § 8 is not closely drawn, and is therefore unconstitutional, because it restricts too much speech, the plaintiffs also argue that it is not closely drawn, and is therefore unconstitutional, because it restricts too little. They contend that § 8 is underinclusive, because, unlike the Federal law upheld in Beaumont, 539 U.S. at 157, 123 S.Ct. 2200, which barred both corporations and unions from making contributions, § 8 applies to corporations but not to unions. The plaintiffs suggest *1189 that, because § 8 does not also regulate unions, it is a "discriminatory contribution ban[ ]" that regulates only certain speakers and thereby impermissibly **438 restricts speech based on viewpoint. See Citizens United, 558 U.S. at 340, 130 S.Ct. 876 ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content").
As the Supreme Court has recognized, "[i]t is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging too little speech." Williams-Yulee v. Florida Bar, --- U.S. ----, 135 S.Ct. 1656, 1668, 191 L.Ed.2d 570 (2015). The government is not required to regulate speech to the constitutionally permitted maximum; "the First Amendment imposes no freestanding 'underinclusiveness limitation.' " Id., quoting R.A.V. v. St. Paul, 505 U.S. 377, 387, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). See Wagner, 793 F.3d at 29 ("a regulation is not fatally underinclusive ... simply because an alternative regulation, which would restrict more speech or the speech of more people, could be more effective" [citation omitted] ). Rather, we consider whether a restriction on speech is underinclusive only to the extent that such underinclusiveness "reveal[s] that a law does not actually advance" a sufficiently important interest, Williams-Yulee, supra, citing Smith v. Daily Mail Publ. Co., 443 U.S. 97, 104-105, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979), or "raise[s] 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint.' " Williams-Yulee, supra, quoting Brown v. Entertainment Merchants Ass'n, 564 U.S. 786, 802, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011). We have already concluded that § 8 advances an important anticorruption interest. Thus, § 8 cannot violate the First Amendment for underinclusiveness unless the failure to include other entities within its scope demonstrates that preventing corruption and the appearance of corruption is a mere pretext for the prohibition against political contributions, and that its true purpose is to silence the political speech of business corporations, professional corporations, partnerships, and limited liability partnerships, while favoring the political viewpoints of those entities that fall outside its scope.
There is nothing in the record suggesting that the Legislature acted with this impermissible intent. Without citing any legislative history, the plaintiffs appear to claim that the true legislative purpose in enacting § 8 and its subsequent amendments was to favor labor unions at the expense of corporations. But there is no evidence to support this claim. Unions are not the only entities excluded from the scope of § 8 ; nonprofit corporations and unincorporated trade associations are also not included. If the Legislature intended § 8 to accomplish viewpoint discrimination against businesses, one would certainly have expected it to include **439 trade associations within its prohibition. Here, the Legislature has an important interest in preventing corruption and its appearance, which it seeks to advance through § 8. The fact that § 8 focuses on corruption stemming from corporate contributions -- "rather than every conceivable instance" of corruption -- does not call this into doubt. Ognibene, 671 F.3d at 191. See, e.g., Wagner, 793 F.3d at 32 (Federal law banning contributions from individual government contractors but not from other entities or individuals with government contracts is not "fatally underinclusive"); Ognibene, supra at 191-192 (municipal law limiting contributions *1190 from individuals or entities "doing business" with government but not from certain labor organizations is not underinclusive). After all, the Legislature "need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." Williams-Yulee, 135 S.Ct. at 1668. We decline to declare § 8 fatally underinclusive merely "because it might have gone farther than it did." Buckley, 424 U.S. at 105, 96 S.Ct. 612, quoting Roschen v. Ward, 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929).[8] **440 For all of these reasons, we conclude that § 8 is constitutional under the First Amendment.
b. Arts. 16 and 19 of the Massachusetts Declaration of Rights. Having concluded that § 8 is constitutional under the First Amendment of the United States Constitution, we must now consider whether it is also constitutional under arts. 16 and 19 of the Massachusetts Declaration *1191 of Rights.[9] As earlier stated, as the final arbiter regarding the interpretation of our State constitution, this Court has "the inherent authority" to declare that our State Constitution affords broader protection to individual rights than does the United States Constitution. Libertarian Ass'n of Mass. v. Secretary of the Commonwealth, 462 Mass. 538, 558, 969 N.E.2d 1095 (2012). This does not mean, however, that we must "exercise [that authority] at every turn." Id. at 559, 969 N.E.2d 1095. Historically, we have interpreted the protections of free speech and association under our Declaration of Rights to be "comparable to those guaranteed by the First Amendment." Opinion of the Justices, 418 Mass. 1201, 1212, 637 N.E.2d 213 (1994). We see no reason to conclude that art. 16 or 19 gives corporations greater rights of political participation than they enjoy under the First Amendment to the United States Constitution. We therefore conclude that § 8 is constitutional under arts. 16 and 19 of the Massachusetts Declaration of Rights.
2. Equal protection claim. The plaintiffs claim that § 8 violates their rights to equal protection for the same reasons they claim that § 8 was underinclusive under the First Amendment: because it prohibits corporations from making contributions, while allowing unions and nonprofit organizations to do so. But this time, the **441 plaintiffs seek to avail themselves of a more rigorous standard of review, contending that -- although under the First Amendment, § 8 need only be "closely drawn" to advance a "sufficiently important interest," Beaumont, 539 U.S. at 162, 123 S.Ct. 2200 -- under equal protection principles, it is subject to strict scrutiny, and therefore must be "narrowly tailored" to serve a "compelling interest." See Citizens United, 558 U.S. at 340, 130 S.Ct. 876. In essence, the plaintiffs seek, by reframing their First Amendment challenge, to effect an end run around the Supreme Court's well-established distinction between independent expenditure limits, which trigger strict scrutiny, and contribution limits, which do not.
In Wagner, 793 F.3d at 32, the United States Court of Appeals for the District of Columbia Circuit rejected precisely this kind of "doctrinal gambit." The court there considered a comparable equal protection claim in a case where individual Federal government contractors challenged the constitutionality of a Federal law that barred them from making Federal campaign contributions while they negotiate or perform Federal contracts. Id. at 3, 32-33. After rejecting the plaintiffs' First Amendment challenge, the court addressed the plaintiffs' claim that the Federal law violated their rights under the equal protection clause of the Fifth Amendment because it applied to individual government contractors but not to other, "similarly situated persons," such as regular government employees. Id. at 32. The court declined to apply strict scrutiny to the Federal law, explaining:
"Although the Court has on occasion applied strict scrutiny in examining equal protection challenges in cases involving First Amendment rights, it has done so only when a First Amendment analysis would itself have required such scrutiny. There is consequently no case *1192 in which the Supreme Court has employed strict scrutiny to analyze a contribution restriction under equal protection principles.... This will not be the first....
"[A]lthough equal protection analysis focuses upon the validity of the classification rather than the speech restriction, 'the critical questions asked are the same.' We believe that the same level of scrutiny ... is therefore appropriate in both contexts....
"[I]n a case like this one, in which there is no doubt that the interests invoked in support of the challenged legislative **442 classification are legitimate, and no doubt that the classification was designed to vindicate those interests rather than disfavor a particular speaker or viewpoint, the challengers 'can fare no better under the Equal Protection Clause than under the First Amendment itself' " (footnote and citations omitted).
Id. at 32-33.
We adopt the court's reasoning here. For equal protection purposes, strict scrutiny is warranted only where a law implicates a suspect class or burdens a fundamental right. See Goodridge, 440 Mass. at 330, 798 N.E.2d 941. Corporations are not a suspect class. And, although the rights to free speech and association are fundamental, see Buckley, 424 U.S. at 14, 96 S.Ct. 612, the Supreme Court has already explicitly stated that, because contributions "lie closer to the edges than to the core of political expression," contribution limits do not sufficiently burden those rights to warrant strict scrutiny. Beaumont, 539 U.S. at 161, 123 S.Ct. 2200. See Buckley, supra at 25, 96 S.Ct. 612. Thus, where the challenged law is a limit on contributions, as here, and where that law does not implicate a suspect class, we follow the Supreme Court's precedents and apply the familiar "closely drawn" standard, regardless of whether the challenge sounds under the First Amendment or under equal protection principles. And, under this standard, we conclude that § 8 is constitutional under equal protection principles, for the same reasons that it is constitutional under the First Amendment.[10]
**443 We therefore conclude that § 8 does not violate the equal protection clause of the *1193 Fourteenth Amendment. Nor does it violate the plaintiffs' entitlement to equal protection under art. 1. See Dickerson v. Attorney Gen., 396 Mass. 740, 743, 488 N.E.2d 757 (1986) ("For the purpose of equal protection analysis, our standard of review under ... the Massachusetts Declaration of Rights is the same as under the Fourteenth Amendment to the Federal Constitution").
Conclusion. For the reasons stated, the order denying the plaintiffs' motion for summary judgment and allowing OCPF's cross-motion for summary judgment is affirmed.
So ordered.

We acknowledge the amicus brief submitted by Common Cause and Free Speech for People.

The Massachusetts law initially prohibited only certain corporations from making campaign contributions, St. 1907, c. 581, § 3, but was soon amended to apply to all "business corporation[s] incorporated under the laws of[ ] or doing business in this commonwealth." St. 1908, c. 483, § 1.

See Alaska Stat. § 15.13.074(f) ; Arizona Rev. Stat. § 16-916(A) ; Ark. Code Ann. § 7-6-203 ; Colo. Rev. Stat. § 1-45-103.7 ; Conn. Gen. Stat. § 9-613 ; Iowa Code § 68A.503 ; Ky. Rev. Stat. Ann. §§ 121.025, 121.035 ; Mich. Comp. Laws § 169.254 ; Minn. Stat. § 211B.15 ; Mo. Const. art. VIII, § 23.3(3)(a); Mont. Code Ann. § 13-35-227 ; N.C. Gen. Stat. Ann. § 163A-1430 ; N.D. Cent. Code § 16.1-08.1-03.5 ; Ohio Rev. Code Ann. § 3599.03 ; Okla. Stat. tit. 21, § 187.2 ; 25 Pa. Cons. Stat. § 3253; R.I. Gen. Laws § 17-25-10.1(h) ; Tex. Elec. Code Ann. § 253.094 ; W. Va. Code § 3-8-8 ; Wis. Stat. § 11.1112 ; Wyo. Stat. Ann. § 22-25-102.

One notable exception to this pattern was the Court's decision in Austin v. Michigan State Chamber of Commerce, 494 U.S. 652, 654-655, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), where the Court upheld a Michigan statute prohibiting corporations from making independent expenditures in connection with State elections. The Court later overruled this decision in Citizens United v. Federal Election Comm'n, 558 U.S. 310, 365, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

As earlier stated, in Federal Election Comm'n v. Beaumont, 539 U.S. 146, 154-156, 123 S.Ct. 2200, 156 L.Ed.2d 179 (2003), the Court identified four important government interests that supported the ban on corporate political contributions. In Citizens United, 558 U.S. at 361-362, 130 S.Ct. 876, the Court repudiated two of these interests, declaring that the government could not restrict corporate political spending in order to protect dissenting shareholders, or in order to combat the distorting influence that corporations, with their accumulated wealth, could wield over the political process, ibr.US_Case_Law.Schema.Case_Body:v1">id. at 348, 130 S.Ct. 876, quoting Austin, 494 U.S. at 660, 110 S.Ct. 1391. See Citizens United, 558 U.S. at 348-356, 130 S.Ct. 876. The Court reaffirmed, however, that the government may restrict corporate political spending in furtherance of its interest in preventing corruption or the appearance of corruption. Id. at 356-357, 130 S.Ct. 876. The Court did not speak of the fourth important government interest identified in Beaumont-- that is, the government's interest in preventing individuals from circumventing valid limits on individual contributions by funneling the contributions through a corporation. Beaumont, 539 U.S. at 155, 123 S.Ct. 2200. We do not interpret the Court's silence as a repudiation of this important government interest, especially where it is so closely related to the government interest in preventing corruption and the appearance of corruption. See Ognibene v. Parkes, 671 F.3d 174, 195 n.21 (2d Cir.), cert. denied, 567 U.S. 935, 133 S.Ct. 28, 183 L.Ed.2d 676 (2012) ("Citizens United... does not disturb the validity of the anti-circumvention interest"); Thalheimer v. San Diego, 645 F.3d 1109, 1124-1125 (9th Cir. 2011) ("[T]he anti-circumvention interest is part of the familiar anti-corruption rationale .... [N]othing in the explicit holdings or broad reasoning of Citizens United... invalidates the anticircumvention interest in the context of limitations on direct candidate contributions"). Cf. McCutcheon v. Federal Election Comm'n, 572 U.S. 185, 218-221, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) (plurality opinion) (government has interest in preventing circumvention of contribution limits).

Under G. L. c. 55, an individual may not contribute more than (1) a total of $1,000 per year to a candidate or candidate's committee, (2) an aggregate of $5,000 per year to a political party or political committees associated with such party, and (3) $500 per year to a political action committee (PAC), other than an independent expenditure PAC. G. L. c. 55, § 7A (a) (1)-(3) ; 970 Code Mass. Regs. § 1.04(12) (2018). There is no limitation on the amount that may be contributed to an independent expenditure PAC. See 970 Code Mass. Regs. § 2.17(4) (2018).

Justice Kafker's concurrence takes issue with our discussion of underinclusiveness, apparently because we fail to adequately address issues that he concedes we "[u]ltimately ... cannot base our decision on." Post at 460-461, 105 N.E.3d at 1206. The concurrence faults us for failing "to explore the complexities of Supreme Court case law regarding differential treatment of business corporations in the context of direct contributions," post at 455, 105 N.E.3d at 1202, and in particular faults us for failing to discuss the Supreme Court's decision in Austin, 494 U.S. at 652, 110 S.Ct. 1391, post at 460, 105 N.E.3d at 1206.
The reason we do not rely on Austin is quite simple: Austin has been overruled. In Citizens United, 558 U.S. at 365, 130 S.Ct. 876, the Supreme Court expressly stated: "Austin should be and now is overruled." The concurrence seems to think that there is some uncertainty on this front, contending that -- because it is "far from clear" whether the reasoning in Austin may still be relied on, post at 460, 105 N.E.3d at 1206 -- we must take Austin into account. But if the Supreme Court had intended to overrule only certain portions of Austin, it would have done so. In fact, in Citizens United, 558 U.S. at 365-366, 130 S.Ct. 876, the Court specifically overruled only portions of its decision in McConnell v. Federal ElectionComm'n, 540 U.S. 93, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003), but overruled Austin without any such qualification. It may very well be that some of the reasoning in Austin-- a case about independent expenditure limits -- remains viable in the context of contribution limits, as the concurrence suggests. Post at 460, 105 N.E.3d at 1206. But to say so would be speculative, and we decline to base our decision on speculation.
Rather than rely on a precedent that has been expressly overruled, we follow the approach that the Supreme Court has taken more recently, in Williams-Yulee v. Florida Bar, --- U.S. ----, 135 S.Ct. 1656, 1668-1670, 191 L.Ed.2d 570 (2015), when analyzing underinclusiveness under the First Amendment. Again, because the First Amendment does not require the government to restrict as much speech as it permissibly can, we consider whether a restriction is underinclusive only to the extent that it raises doubts about whether the restriction does in fact advance a sufficiently important interest or indicates that the government is acting with an impermissible purpose. Id. at 1668. The concurrence seems to take the view that the "differential treatment" of corporations and unions, post at 456-457, 105 N.E.3d at 1202-1204, may render § 8 impermissibly underinclusive. But "differential treatment" on its own does not render a law unconstitutional under the First Amendment. See, e.g., Wagner v. Federal Election Comm'n, 793 F.3d 1, 32 (D.C. Cir. 2015), cert. denied, Miller v. Federal Election Comm'n, --- U.S. ----, 136 S.Ct. 895, 193 L.Ed.2d 789 (2016) ; Ognibene, 671 F.3d at 191-192. The question is whether the exclusion of entities such as unions, nonprofit corporations, and unincorporated trade associations from its scope suggests that § 8 does not advance a legitimate anticorruption interest, but instead serves the illegitimate purpose of discriminating against the viewpoints of corporations. For the reasons already stated, we conclude that it does not.

Article 16 of the Massachusetts Declaration of Rights provides, in relevant part, that "[t]he right of free speech shall not be abridged." Article 19 provides that "[t]he people have a right, in an orderly and peaceable manner, to assemble to consult upon the common good."

Because it is not necessary to our decision, we do not decide whether business corporations and the other profit-making entities within the scope of § 8 are similarly situated to or treated differently from other entities, such as unions or nonprofit organizations, that are outside its scope. See Matter of Corliss, 424 Mass. 1005, 1006, 675 N.E.2d 398 (1997) ("One indispensable element of a valid equal protection claim is that individuals who are similarly situated have been treated differently"). We note that, under current Massachusetts law, it is not clear to what extent unions and nonprofit organizations are free to make political contributions.
This is because, separate from its ban on corporate contributions, G. L. c. 55 also regulates certain kinds of organizations known as "political committees." As defined in G. L. c. 55, § 1, a "political committee" includes any "organization or other group of persons ... which receives contributions or makes expenditures for the purpose of influencing the nomination or election of a candidate, or candidates ...." If, under this broad definition, a union or nonprofit organization that makes even a nominal political contribution is considered a political committee, such entities effectively would be prohibited from making any contribution because, once characterized as a political committee, they would be required not only to meet burdensome disclosure requirements, but also to dedicate their resources exclusively to their political purpose, meaning that they could no longer serve their intended purposes as a union or nonprofit organization. See 970 Code Mass. Regs. § 2.06(6)(b) (2018) ("No political committee ... may pay or expend money or anything of value unless such transaction will enhance the political future of the candidate or principle on whose behalf the committee was organized").
In 1988, OCPF issued guidance in the form of an interpretive bulletin, explaining that a nonpolitical organization -- that is, an organization that does not solicit or receive funds for any political purpose -- will not be considered a political committee as long as it does not make "more than incidental" political expenditures, defined as those "exceed[ing], in the aggregate, ... either $15,000 or 10 percent of [the] organization's gross revenues ... , whichever is less" (emphasis omitted). OCPF, Interpretive Bulletin, OCPF-IB-88-01 (Sep. 1988) (rev. May 9, 2014). Thus, under OCPF's interpretation, a union or nonprofit organization can spend up to $15,000 or ten per cent of its gross revenues, whichever is less, without triggering the regulations applicable to political committees.
An administrative bulletin, as opposed to a regulation that has benefited from the full rulemaking process, with opportunity for notice and comment, see G. L. c. 55, §§ 2 -3, is entitled to substantial deference but it is not a promulgated regulation that carries the force of law. See Global NAPs, Inc. v. Awiszus, 457 Mass. 489, 496-497, 930 N.E.2d 1262 (2010) ("although [administrative agency's guidelines] are entitled to substantial deference, they do not carry the force of law"). The question whether OCPF's interpretive bulletin accurately interprets c. 55 has not, to our knowledge, been addressed in a court of law. Because it is not necessary to our decision, because it was not addressed by the judge or briefed by the parties, and because a ruling would have substantial consequence on entities that are not parties to this action, we decline to address it here.